**Abad PEREZ, Plaintiff,**

v.

**Anthony CUCCI, as Mayor of Jersey City, and Individually; the City of Jersey City; Walter Adams, as Director of Police and Individually; Jaime Vazquez, as City Councilman and Individually,**

**Benjamin Lopez, as City Business Administrator and Individually, Defendants.**

**Civ. A. No. 86–3595.**

United States District Court, D. New Jersey.

May 2, 1989.

Ignacio Perez, Jersey City, N.J., for plaintiff.

Raymond Reddington, Asst. Corp. Counsel, City of Jersey City, Jersey City, N.J., for defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge.

### I. INTRODUCTION

The issue in this case, following a fifteen day bench trial, is whether the civil rights of plaintiff, Abad Perez, a former Jersey City Police Officer, were violated when he was demoted from the rank of plainclothes detective to uniformed patrolman because he had openly espoused the candidacy of a mayoral incumbent who was defeated in his bid for reelection in 1985.[1]

In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the United States Supreme Court concluded that where the hiring authority can demonstrate that *party*

---

**1.** Plaintiff seeks relief from defendants Anthony Cucci, Walter Adams, Jaime Vazquez, and Benjamin Lopez, in both their official and individual capacities.

Anthony Cucci was a candidate for and elected Mayor of the City of Jersey City in 1985. He continues to serve in that position at the present time.

Defendant Walter Adams was appointed as a police officer with the Jersey City Police Department in 1964. He continued as a patrolman until 1970 when he was assigned as an acting detective. From 1970 through July 1, 1985 Walter Adams was continuously assigned in the detective division. In 1975, he was reassigned from acting detective to paid detective. He later, as a result of successfully completing Civil Service exams, rose to the rank of Lieutenant in the Detective Division. From July 1, 1985 through February 26, 1988, Walter Adams served as Director of the Police Department. Thereafter he assumed the duties of the Chief of Police.

Defendant Jaime Vazquez was a candidate for and subsequently elected to the City Council of the City of Jersey City in 1985, and continues to serve in that capacity at the present time.

Defendant Benjamin Lopez, an active Cucci supporter, was appointed to the position of city Business Administrator on July 1, 1985. In his role as Business Administrator, Lopez is empowered to administer policies and procedures that the Mayor implements. Record at 1195 (Lopez). Prior to assuming this position, Lopez served as a City Councilman.

affiliation is an appropriate requirement for the effective performance of the public office involved a public employee occupying such a position can be replaced based on political party or group affiliation. Here, as the overwhelming evidence shows, fealty to a particular candidate, rather than party, was the unconstitutional criteria utilized for reward or punishment. For the reasons stated *infra*, I have found that Abad Perez deserved the protection of the United States Constitution and defendants' deprivation of such protection violated plaintiff's first and fourteenth amendment rights.

Before reciting in detail my findings of fact and conclusions of law, I believe something should be said concerning what I perceive to be an unconstitutional misuse of a venerated political practice—the spoils system. In their respective opinions in *Elrod* and *Branti*, Justices Brennan, Stevens, and Powell eloquently dealt with this subject. Nevertheless, I believe that a few more words are in order. Historically, political patronage has played a role in the personnel appointments on the federal, state, and local levels. Indeed, as Justice Powell noted, "the use of patronage in the early days of our Republic played an important role in democratizing American politics." *Branti, supra*, 455 U.S. at 522 n. 1, 100 S.Ct. at 1296 n. 1. *See also* S. Morison *The Oxford History of the American People* 736–37 (1965). With respect to the use of patronage on the federal level in the nineteenth century, Senator William Marcy of New York once stated that the politicians generally:

" 'see nothing wrong in the rule that to the VICTOR belong the spoils of the ENEMY.' Rotation in office was nothing new—Thomas Jefferson had removed 10 per cent of the officials in John Adams' administration when he took office—but the phrase 'spoils system' had a dirty ring to it. When during his first eighteen months in office [Andrew] Jackson replaced about the same percentage of appointees, his opponents contended that he had 'introduced corruption into the central government....' The President never denied employing the system;

he did deny that it was corrupt. Rotation in office, he explained, prevented government from becoming a continuous 'engine for the support of the few at the expense of the many.' "

1 *The American Heritage Pictorial History of the Presidents of the United States* 205 (K. Leisch ed. 1968). As stated above, President Jackson never had any qualms about the spoils system:

"His theory, stated in his first annual message, was that 'the duties of all public offices' were so 'plain and simple' that any man of average intelligence was qualified; and that more would be lost by continuing men in office than could be gained by experience. Naturally, when the Whigs won in 1840 they threw the Jackson men out, and when the Democrats came back under Polk, they threw the Whigs out; and so on. The consequences were more power to party organizations, diminishing prestige of the federal civil service, and decreasing efficiency. This sort of thing became so engrained in the American political system that, despite repeated reform legislation, it still continues. [With respect to such proposed reform, in] ... 1959 Senator Herbert H. Lehman of New York 'called for the eradication of the spoils system in politics,' especially the removal of the judiciary from 'the control of party bosses.' "

S. Morison, *supra*, at 426–27.

Of course, the spoils system has not been confined to the federal government. In speaking of state politics, one author observed:

"The state machine, a small number of great cities apart, provides the party with all the qualities out of which its character is moulded. It has one single aim—that of victory at the polls, and its interest in policies is given, not by what they are in themselves, but by the contribution they can make to victory. For victory means jobs for the henchmen of the party in the state; it means the chance of lucrative contracts; it means safeguarding its dependents, very often, from the necessity of earning a living in

the ordinary way. The successful machine may put its own lawyers on the courts; it may secure the support of powerful business interests; still more, it may prevent those interests from helping the other side. The machine is essentially a broker of ideas; it sets itself the task of finding out what principles of action are most likely to win a majority. It has to find the right candidates for the right jobs; perhaps even more, it has to prevent the wrong candidates from being chosen. It must make the voters feel that their well-being is directly related to the victory of the party it controls; and to create that feeling it has to have an accurate sense of the influences which count for most in the state. It is not an organization for the discovery of ideas for their own sake; it is an organization of men who come out first for the winning ideas at the right time. Its business is thus to keep its finger on the pulse of public opinion; but it must be able, as it judges public opinion, to work out with precision the weight that attaches to the different elements out of which public opinion is compounded. It reaches out from the state boundaries to the smallest precinct in the area it seeks to capture. Those who control it must know not only how to win the support of the great corporation; they must know as well how to convince a group of poor immigrants, to whom citizenship has just been granted, that their friendship is imperative. They must be able to measure just what volume of reward, the support they gain requires without risking, in the gift of that reward, the good opinion of the mugwumps whose vote determines most elections. They must possess every type of political *condottiere*, from an orator like Choate to a drill sergeant like Mayor Hague of New Jersey.

H. Laski, *The American Democracy: A Commentary and An Interpretation* 147–48 (1948).

It can be stated with some confidence that Frank Hague was something more than a "drill sergeant". As one historian recalled, in recounting the totality of the power Hague exerted as "mayor of Jersey City and ruler of New Jersey" for 30 years, Hague "bellowed once in a moment of unguarded candor.... 'I am the law.'" Fleming, *The Political Machine II: A Case History "I am the Law", in* XX American Heritage 33 (June 1969), Mayor Hague engaged in what the author described as "an all-out assault on police laxity" to gain power, project a reformed image of the police department and "open an unparalled number of jobs [for] his dispensation", ostensibly to stop the "moral decay of the police force." *Id.* at 35. To this end, Mayor Hague took several steps. For instance, "[a]s many as 125 men were put on trial in just one day for violating departmental regulations. Hundreds of police officers were ruthlessly demoted or dismissed. Into the decimated ranks Hague poured his tough young Horshoe followers, from whom he culled an elite squad of plain clothesmen, called Zeppelins, who wove a web of secret surveillance around the entire force." *Id.* at 35. Thus a reading of that period of Jersey City's history suggests that what happened to Abad Perez was merely a reflection of "business as usual" and that Abad Perez's problems were part of a historical political continuum.

It is difficult to disagree with Justice Powell's observation that such "... patronage hiring practices sufficiently serve important state interests including some interests sought to be advanced by the first amendment to justify a *tolerable* intrusion on the first amendment interests of employees or potential employees", *Elrod, supra,* 427 U.S. at 387, 96 S.Ct. at 2696 (emphasis added). Although "the Court's constitutional holding ... [regarding the permissibility of patronage dismissals may] displace[ ] political responsibility with judicial fiat ...," *Branti supra,* 455 U.S. at 534, 100 S.Ct. at 1303 (Powell, J. dissenting), the egregious facts of this case necessitates a finding that "[p]atronage, ... to the extent it compels or restrains belief and association, is inimical to the process which undergirds our system and is 'at war with the deeper traditions of democracy embodied in the first amendment.'" *Elrod, supra,* 427 U.S. at 357, 96 S.Ct. at 2681,

*quoting in part Illinois State Employees Union v. Lewis,* 473 F.2d 561, 576 (7th 1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). I find for the reasons stated below that the constitutional rights of Abad Perez were intruded upon *intolerably.*

Upon review of the entire record, and evaluation of the credibility of all of the witnesses, the court enters the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## II. FINDINGS OF FACT

### A. *Introduction.*

Plaintiff began serving as a patrolman in the Jersey City Police Department ("JCPD") on October 12, 1979. Effective October 11, 1982, plaintiff was promoted to the position of detective, and received both a title change from police officer to detective, and a concommitant salary increase in the amount of approximately $1248.00.[2] *See* Plaintiff's Ex. 18; Attachment A to Plaintiff's Ex. 1. Prior to his 1982 promotion, plaintiff vigorously supported the 1981 election bid of Gerald McCann. The circumstances suggest that as a result of his efforts, he was rewarded with this promotion.

Although the position of detective is not one that the New Jersey Department of Civil Service recognizes,[3] JCPD views the position of detective as one rank superior to that of a uniformed patrolman, and a position to which an officer may ascend without taking a civil service examination. *See* Rules 229 & 525 of the Rules and

Procedure Manual of the JCPD; Rule 3:182 of the Jersey City Police Manual; Record at 716, 747–48, 751, 831–32, 862 (Adams). Rule 229 provides that "[d]etectives have authority over patrolmen at the scene of any crime." In addition to this supervisory role, the members of the department perceive the position of detective as more prestigous, and seek to hold such a position "because it gives [an officer] more freedom to move around ... they're in plainclothes ... [they] [carry] a gold badge ...," and receive a greater salary. *See* Record at 629–30, 771, 778–80, 804, 854 (Adams). *See also* Record at 1008 (Healy) (stating that reassignment from the position of detective to patrolman constitutes a demotion because "when you have the plainclothes [you have a] better chance of getting money than if you're out there in the blue."). *See also* Record at 651 (Adams).

Plaintiff continued in the position of paid detective[4] until July 1, 1985. Effective on that date, plaintiff was demoted to the rank of patrolman. *See* Attachment A to Plaintiff's Ex. 1; Plaintiff's Ex. 33. As stated previously, at issue in this case is whether or not plaintiff was demoted in retaliation for having exercised his first amendment rights. To decide this issue, it is necessary to review not only plaintiff's political activity but also the role that politics have played in the operation of the Jersey City Police Department.

### B. *Police Department Patronage.*

As stated in the May 24, 1988 report of Paul DePascale, former Director of the Jersey City Police Department:

---

**2.** Because of plaintiff's employment experience immediately prior to his appointment as a Jersey City police officer, plaintiff was granted seniority, retroactive to February of 1977, with respect to benefits provided under the department's pension plan. Specifically, before joining the JCPD plaintiff served as an investigator in the Division of Alcohol and Beverage control for two and one-half years, a patrolman for the Willingboro Police Department for seven and one-half months and an investigator in the Passaic County Prosecutor's Office for one year. *See* plaintiff's Exhibit 8.

While employed by the JCPD, plaintiff attended law school on a part-time basis. He has been admitted to the bar of the state of New Jersey since June, 1987.

**3.** The first state civil service promotional grade in the JCPD is that of sargeant. *See* Rule 525 of the Rules and Procedure Manual of the JCPD.

**4.** Adams contends that after July 1, 1985, the department distinguished the position of "paid detective" from that of unpaid detective, the latter carrying a silver badge, and working without a salary differential from uniformed police officers of similar experience, and the former carrying a gold badge and in receipt of a salary increase. Despite these purported differences, both types of detectives perform the same work and have supervisory authority over uniformed patrolmen. *See* Rules 229 & 239 of the Rules & Procedures Manual of the JCPD; Record at 651 (Adams).

Over the decades of its existence the Department and its personnel have repeatedly been used (sometimes willingly) and abused by politicians some of these abuses have been subtle, some blatant. The combined effect of this interference and influence has spawned nearly every problem affecting the Department today. How does a less qualified detective become a detective? How does a qualified detective wind up on patrol? How are promotions decided upon? Who works steady day tours with weekends off? Where were so many special units created? The answers to these questions needn't be set forth herein since we all know them. If this, or any, Department is to be professionalized for the public good, then the ability of politicians to influence or direct police operations should be strictly limited to legitimate governmental concerns such as setting policy and funding its operations. A department which is responsive to political concerns cannot faithfully fulfill its duty to the public it is expected to serve. A police department, like an individual, cannot serve two masters. Fealty to one, must by definition involve disloyalty to the other. Political influence over, and interference with the Department must end if this effort is to be successful.

Report of the Director of the Jersey City Police Department, at 12 (May 24, 1988) (hereinafter "DePascale Report"). *See also id.* at 9 (stating that one of the author's goals was to reorganize the department [5] "to eliminate the political interference that has had a strangle hold on the Department.").

Longtime department members as well as members of the community have observed the manner in which city politics have influenced the department's operations. For instance, Lt. Healy, a policeman in Jersey City for over thirty years, observed that typically, after an election, an unspoken practice was implemented under which individuals were promoted and demoted throughout the detective—uniform ranks as either a reward or punishment for that individual's political support. Record at 1013–14 (Healy). Lt. Healy stated that he observed this pattern repeatedly throughout his tenure in the department and believed certain promotions made following the election of former Mayor McCann, for example, constituted reward for political support. *Id.* at 1013–14, 1016. Although Lt. Healy did testify that while all promotions to detective did "not necessarily" constitute the repayment of a political favor, because some promotions were based on merit, he stated that at different points in an officer's career political support for the "proper" candidate became important to career advancement. *Id.* at 1011–12, 1017–18.

Walter Adams, who, during the relevant period served as Director of Police, and for the purposes of this opinion shall refer as such, also described the promotion/demotion process that existed in the department prior to 1985 as "somewhat political." He recounted that certain individuals were promoted, demoted, or received assignments based upon who they supported for Mayor. Record at 626, 658, 661, 699 (Adams).

Similarly, Jaime Vazquez, a Jersey City councilman stated that:

Throughout the history of Jersey City, the police department has been a political arm.

Record at 1021 (Vasquez). Glenn Cunningham, also a city councilman, observed that "there were a lot of appointments made to

---

5. It warrants recognizing that in 1987 and 1988, the Mayor and JCPD officials instituted a variety of programs and procedures to eliminate the role of politics in the department. For instance, in April and September of 1987, various rules were proposed that delineate permissible political activity in which the members of the department may engage. *See* Record at 783–85, 802 (Adams); Defendant's Ex. 5. These limitations are included in the 1988 Jersey City Police Manual at 3:128. Furthermore, in the DePascale Report, the drafters recommended, *inter alia,* a reorganization of the department, including the detective ranks, to "allow for the removal of political control and return of control to the top administrators of the Department." DePascale Report at 9. *See also* Record at 661–64 (Adams) (stating that one of the motivating forces behind the DePascale recommendations was to eliminate political interference with personnel decisions in the JCPD and thereby reduce political pressure in the department.)

plainclothes detective units that were probably based on police officers who got it politically." Record at 1118 (Cunningham). Councilman Cunningham further testified that, while some promotions were based on merit, others had been "tainted with some of the political" patronage that had characterized personnel decisions in the JCPD. *Id.* at 1118–19.

Mayor Anthony Cucci also acknowledged the existence of politics in the police department. Record at 945 (Cucci). During the course of his testimony, the following colloquy ensued:

Q. ... [A]re you aware or have you been aware of political interference with the Jersey City Police Department prior to your becoming Mayor in 1985?

A. Yes. It was a long-standing practice.

Q. It was business as usual?

A. Prior to '85, my election?

Q. Prior to 1985, your election.

A. Yes.

*Id.* at 942. The Mayor's recognition of the role that politics had played in the police department is further reflected in his joint decision with then-Director of Police Adams to implement:

... a reorganization plan that would honor on civil service lists, ..., but made promotions based on need rather than political desire or need, and the only time promotions are made, when there's valid openings.

Record at 937 (Cucci). Additionally, Mayor Cucci recognized that one of the main goals of the DePasquale Report was to eliminate the political interference that had existed for "a long number of years" in the JCPD. *Id.* at 943–44.

Although defendants assert that promotions/demotions that occurred following the 1985 mayoral election were not the result of the political patronage system that had previously existed in Jersey City, the record does not support such a contention. For example, by his own admission, Director Adams, who contributed to the DePascale Report, stated that the 1988 report incorporated the political characteristics of the department as they existed through May, 1988, and that the proposals therein were intended to reduce the political pressure that existed in the department as of that date. Record at 663–64 (Adams). The testimony of Councilmen Vazquez and Cunningham confirmed that the observations of the DePasquale Report—that politics influenced departmental personnel decisions—were valid prior to May 1988, not just prior to 1985.

Members of both the city council and the JCPD believed that personnel assignments were politically based, even after the 1985 election. *See, e.g., Id.* at 666. In this regard, Councilman Vazquez was asked about the role of politics in the assignments made to members of the JCPD following the 1985 election:

Q. During or after the 1985 mayoral campaign, did you ever hear anyone make statements about the assigning of Jersey City police officers in the Detective Division?

A. Not to me, no, I did not. *The transfers came just like they do every four years when there's a new mayor.*

Record at 1053 (Vazquez). (emphasis added). *See also* Record at 1120–22, 1143 (Cummingham) (stating that certain promotions/demotions in 1985 were the result of political patronage and while he "believe[d] there was a lot less politics ... [he's] not saying there was no politics "in the department after the 1985 election).

Thus, the record supports a finding that politics indeed played a role in departmental personnel decisions. The record also supports a finding that the JCPD existed, in part, as a political arm through which rewards for political support were granted and retribution for political opposition were meted out. *See* Record at 191, 193–95 (Coyle); Record at 337, 341–47 (Reddington); Record at 657–58, 661–66 (Adams); Record at 867–68, 878 (Perez, V.); Record at 915–16, 942 (Cucci); Record at 1012–13 (Healy); Record at 1021, 1032–33 (Vazquez); Record at 1117–20 (Cunningham).

While the record supports such a conclusion, the viability of plaintiff's civil rights claim depends upon proof that political ret-

ribution was the catalyst of his demotion. To answer this question, it is necessary to examine plaintiff's political activities during the 1985 election.

### C. Plaintiff's Political Activity.

The record reveals that the 1985 mayoral race between then-incumbent Gerald McCann and Anthony Cucci was hotly contested and that the supporters of these candidates campaigned aggressively and vigorously. During the campaign, plaintiff openly and actively supported the reelection bid of then-Mayor Gerald McCann. Specifically, plaintiff attended numerous rallies and meetings. As president of the Hispanic Law Enforcement Society of Hudson County, plaintiff's name and/or photograph appeared (1) in campaign literature and political advertisements that were published either by the McCann reelection committee and (2) in paid political advertisements in the Jersey Journal and other tabloids circulated throughout Hudson County. *See e.g.* plaintiff's Ex. 32. As explained below, plaintiff's support of the McCann candidacy was well known, and because of his actions he became a target for retribution.

### D. The 1985 Election.

During the 1985 Mayoral campaign, Cucci supporters gathered at the Anthony R. Cucci Association, located on Brunswick Street in Jersey City, and at other locations in the city and discussed, *inter alia,* the tactics and identities of individuals who supported the opposition. Record at 284–87 (Benitez); Record at 528 (Velazquez). Because of a concern about alleged police harassment of Cucci supporters by McCann supporters, Cucci campaign workers were instructed to report any improper police conduct to John Dougherty, a Cucci campaign worker. Record at 294–297, 305 (Benitez). Record at 1081–82, 1085 (Vazquez). The following colloquy ensued

between Councilman Vazquez and counsel on this point:

Q. So it would be fair to say that your campaign and that of Anthony Cucci in 1985 was intent on keeping tabs on any allegations of police harassment?

A. Taking into consideration that the police department was being used politically against us, we—sure we—any campaign would keep a record of that.

\* \* \* \* \* \*

Q. [A]nd the campaign was keeping tabs of these allegations [of harassment]?

A. That's right.

Q. How did they keep tabs of these names?

A. Well, an example, I guess may have been [certain vehicles were stopped and drivers were arrested], the police officers' names had to go on the reports. So, I mean, that's how you get a person's name.

Q. Some sort of list was prepared?

A. I wouldn't reach that assumption, no I think that each case was handled individually.

*Id.* at 1082–83. While Councilman Vazquez denied any knowledge of the preparation of a formal list of police officers who reportedly engaged in such conduct, *id.* at 1083–84, he acknowledged that the campaign workers reported incidents of harrassment and headquarters indeed kept tabs on when "police officers acting on behalf of the McCann campaign used their authority as police officers...." to advance their political views. *Id.* at 1084–86. Hence, through such reports of harassment, certain police officers were identified and apparently "black listed." Record at 288 (Benitez), 319–21. *See also id.* at 288–89, 316 (stating that Benitez believed that Cucci campaigners had maintained a list of police officers against whom reprisals for alleged harassment would be taken.) [6]

The testimony on this point is as follows:

---

**6.** Defendant Adams stated that he declined to consider certain recommendations regarding promotions and demotions. Arguably, this implicitly reflects that a list of some form had been maintained for the assignment of positions in his department based upon criteria other than that of which Adams had approved. *See also* Record at 951 (Cucci) (where he admitted that he recommended that certain individuals

Q. So you did discuss with Mr. Vazquez a list, correct?

A. Yes.

Q. Do you recall what he said to you about this list?

A. He said that these people would be taken care of, you know, if and when they won.

*Id.* at 321. With regard to the type of retaliation Cucci workers expected to take, the testimony of Mr. Benitez reads:

Q. Did you ever hear Jaime Vazquez say where Abad Perez would be reassigned after Councilman Vazquez was elected?

A. Yes.

Q. When did you hear him say something?

A. In the Cucci Civil Association when specifically, I don't recall. But he would be walking the beat by the river.

*Id.* at 322. *See also id.* at 289, 298–99.

Capt. Victor Perez, plaintiff's brother, who is also a member of the JCPD, testified to a conversation between himself and state trooper Juan Perez, a staunch Cucci supporter, regarding an intent on the part of the Cucci camp to retaliate against those who supported the McCann candidacy by "trying to get certain people that supported Cucci to get certain spots." Record at 880–82 (Perez, V.). Capt. Perez also stated that:

As a matter of fact, [Trooper Perez is] the one that mentioned the list because he said, "we're going to get those guys that are going against us. We're going to make them walk the beat," or something like that.

*Id.* at 882.

In sum, the above evidence clearly reflects that the Cucci forces kept tabs on the conduct of certain police officers who, as a result of their conduct would be subject to retaliation if Cucci were elected, in the form of a demotion from detective to uniformed patrolman, assigned to walk a lonely beat at a late hour. Record at 288, 290–91, 293, 296, 299, 305 (Benitez) (attributing such admissions to defendants Vazquez and Lopez).

The record further reflects that Cucci workers identified plaintiff as an officer who had engaged in harassment, described him "as a person who could not be trusted" and workers were told "to watch out for him." *Id.* at 296–97; Record at 1163 (Dougherty). Councilman Vazquez testified that he believed plaintiff had used his badge to intimidate voters and, hence, used his police power in political situations. Record at 1022, 1031, 1040 (Vazquez).

Moreover, the record reveals that a number of Cucci's closest supporters and/or aides were aware of plaintiff's aggressive support of the McCann candidacy, and openly discussed plaintiff's opposition to the Cucci ticket. *See id.;* Record at 286–87, 296, 305, 310 (Benitez); Record at 882 (Perez, V.); Record at 528–29 (Velazquez); Record at 1140–41 (Cunningham); Record at 1208, 1219–20 (Lopez). In this regard, Mr. Benitez recalled that defendant Vazquez had:

... been very annoyed with the way Mr. Abad Perez was going around.... for Jerry McCann.

Record at 296–298 (Benitz). Similarly, Councilman Cunningham stated that:

Jaime Vazquez would often, in frustration, say to me, 'Glenn, what can we do about this fellow?' In reference to Abad Perez. And there wasn't at that particular time anything we could do because of the fact that the department was being run by the campaign manager....

Record at 1141 (Cunningham).

Apparently Vazquez harbored animosity toward plaintiff not only because of his aggressive support of Mayor McCann, but also because in lending such support, Vazquez believed Abad Perez betrayed the Hispanic community of Jersey City. Record at 1024, 1071–74 (Vazquez); Record at 288–89 (Benitez). During his testimony Vazquez attempted to soften his position, stating that he "was really referring to Hispanics who had betrayed the community

who shared his views and supported him re-

ceive certain positions.)

by supporting the candidacy of Mayor McCann, not only [Abad] Perez." [7]

Despite this caveat, the record reflects that shortly prior to the June 1985 runoff election between McCann and Cucci, a large group of supporters of both candidates converged in the downtown area of Jersey City. The confrontation between the groups was somewhat heated, motivating then-police officer Joseph Coyle to request police reinforcements. Plaintiff was one of the first members of the force to respond to the call. After plaintiff arrived at this impromptu political rally, then Councilman-elect Jaime Vazquez, wielding a bull horn, announced to the crowd that certain "traitor hispanic detectives", of whom Vazquez considered plaintiff to be one, would end up not being where they [were at the time of the rally but rather would have to trade in their gold badges for a uniform and would have to walk a beat]." Record at 1015, 1074 (Vazquez). *See also* Record at 72, 235 (Perez, A.); Plaintiff's Ex. 20 (plaintiff's contemporaneous notes regarding the rally and the remarks that plaintiff attributes to Councilman Vazquez).[8] Record at 532 (Velazquez) (recalling an argument between plaintiff and Councilman Vazquez at the June 8, 1985 rally). Mr. Velazquez stated in his affidavit:

I remember an incident that occurred on Saturday, June 8, 1985 on Grove Street near Fourth Street in the Downtown section of Jersey City. I had been doing propaganda work on behalf of the Cucci ticket in the area and recall a crowd of people had congregated in the vicinity. Then Councilman–Elect Jaime Vazquez was there and I also saw Abad Perez, who at the time was a Jersey City Detective. I was doing my campaign work, but I distinctly recall that Mr. Vazquez made certain declarations over a bullhorn into the crowd to the effect that those detectives who were holding temporary detective badges would lose those gold badges once we got into office, that they would have to turn in their gold badges.

**7.** While I believe that Mr. Vazquez may have perceived plaintiff to have been a traitor to the Hispanic community by supporting a candidate that Vazquez believed to have been anti-hispanic, *see* Record at 1024 (Vazquez), and while Vazquez is entitled to this peception, the accuracy of this perception has no bearing on the civil rights allegations here, since the defendants do not contend plaintiff's demotion was related to the imposition of a sanction for engaging in purportedly anti-Hispanic conduct. Rather, the issue here is whether or not plaintiff was retaliated against for exercising his first amendment right in expressing support for and associating with a particular candidate, irrespective of how that candidate and his supporters were perceived by the Hispanic community.

**8.** Plaintiff's report to Deputy Chief Frank Victor is set forth below:

 FROM: Detective Abad Perez # 78
 File #
 TO: Deputy Chief Frank Victor
 Date 6–8–85
 SUBJECT: Political Harassment
 Sir:
U/s was on Patrol in the East District when I heard a call from a solo-motor cycle Unit. He said that he was off at Second Street and Grove Street with two groups of political supporters. He stated that he would be off there until further notice. U/s was in the area and responded to give aid to the Motorcycle Unit. Once off at that location I observed a group of McCann Supporters and a gropu [sic] of Cucci supporters. Botj [sic] groups were very verbal but no physical contact was made due to officers efforts. I saw Mr. Jamie [sic] Vasquez on the corner of Second and Grove Street with about 7 other supporters. One of Mr. Vasquez's supporters was carrying what appered [sic] to be a knife. I approached the Hispanic male and asked to see what the objects were. The supporter showed me that it was not a knife but a pen. At this point Mr. Vasquez (Councilman Elect Ward E) came over to me in a very threatening manner. He pointed his finger at me and said "Det. Perez don't harass my suppoters [sic], don't you dare harass my supporters". I then informed Mr. Vasquez that I was doning [sic] my job and that I never harass any person. He then turned around and with the bullhorn he had in his hand said "Once we are elected we are going to take those traitors who McCann made detectives, those Hispanic Detectives and take their old Badge away from them and put them into uniforms and have them walk a beat, so that they learn their lessons. U/s did not take any action at this point and I just kept his group away from the other group.
 Respectfully,
 s/Abad Perez
 Det. A. Perez # 78
Plaintiff's Ex. 20.

Plaintiff's Ex. 37, Affidavit of Hugo Velazquez, subscribed to August 3, 1987 at ¶ 3.

I note that during the trial, Mr. Velazquez stated that the above statement was untrue. Testimony of Hugo Velazquez at 537. Despite the purported recantation, I believe the above statement was true. Mr. Velazquez's recantation is unbelievable. Despite the fact that Velazquez attempted to recant this statement, Mr. Vazquez testified that, following an incident between plaintiff and a Cucci supporter, Velazquez stated that he would "like to see Abad Perez walking a beat somewhere on Ocean Avenue." Record at 1044–45 (Vazquez). Vazquez interpreted this to mean that Velazquez would have liked to see plaintiff transferred from the plainclothes ranks as a detective, to the uniform ranks, as a patrolman, walking a beat.[9] *Id.* at 1046. At trial, Mr. Vazquez stated that he "might have agreed with Mr. Velazquez'[s]" desire to penalize plaintiff for his political support. *Id.*

### E. Plaintiff's Demotion.

Following the June 11, 1985 runoff election, Anthony Cucci was elected mayor. He and his administration were sworn in and assumed office on July 1, 1985. On that day, Edwin Healy, then a lieutenant in the department, received an order from his supervisor, then-Deputy Chief Fran Victor, to notify plaintiff that he had been demoted from detective to patrolman. Record at 1005–07 (Healy). As Lt. Healy put it, he informed plaintiff "[t]he axe has fallen, you're back in uniform." *Id. See also* Record at 79 (Perez, A.) (stating that he interpreted this statement to mean that the new city administration was "cutting off

his head" because of his support for former Mayor McCann).

According to the CS–6 personnel form, which Director Adams and Mr. Lopez signed, the demotion was effective July 1, 1985, at which time plaintiff had accumulated two years and eight months seniority as a detective. *See* Plaintiff's Ex. 33. Interestingly, the word "demotion," which had been typed on the document, had been crossed out in black pen,[10] and the word "returned" had been handwritten above it.

Notification of plaintiff's demotion apparently came more swiftly than normal, and, as will be explained *infra,* occurred without review of his personnel file and without explanation. Record at 89–90 (Perez, A.); Record at 1215–16, 1230–32 (Lopez); Record at 681, 697 (Adams). Record at 1010 (Healy).

Director Adams explained that plaintiff, along with twelve other detectives,[11] were purportedly reassigned and received concommitant salary decreases pursuant to a program providing that detectives with less than four years experience as Jersey City patrolman prior to achieving rank of plainclothes detective were to be returned to a uniformed position. Record at 632, 639–40, 766–67 (Adams). Adams stated that by requiring an officer to accumulate four years of service before becoming eligible for à promotion, and the commensurate pay increase, he hoped to eliminate a situation in which less experienced officers held superior positions and received greater pay than those with more years of service on the force. *Id.* at 632, 638–39, 645, 765. Director Adams further stated that the four year criteria was primarily set to justify the receipt of additional pay rather than to ensure that officers in supervisory positions had more experience than those officers who they were responsible to super-

---

**9.** With respect to this statement, Mr. Velazquez testified he was "kidding around" when he stated that plaintiff "should be assigned to the midnight shift by the river to see how tough he is." Record at 533–34 (Velazquez).

I further note that in his affidavit, Mr. Velazquez attributes this comment to Mr. Vazquez. Affidavit of Hugo Velazquez, subscribed to August 3, 1987, at ¶ 4.

**10.** Plaintiff testified that when he originally reviewed this document no interdelinations or other handwritten changes appeared thereon. Record at 82–84 (Perez, A.).

**11.** Adams states that other demotions were made between July and September of 1985 to prevent officers from accumulating five consecutive years of experience in the rank of detective and thereby break their tenure. Record at 701 (Adams).

vise. *Id.* at 847–49. Indeed, he testified that "experience is not the criteria for the reassignment. The criteria for the pay is the four years." *Id.* at 849.[12]

Adams explained that he selected a period of four years based on the four-year salary scale set forth in the union contract[13] and upon personal experience. He believed any detective with less than four years experience lacked sufficient experience to be assigned as a detective with supervisory authority over those with more years of service in the JCPD).

12. *But see* Defendant's Response to Plaintiff's Interrogatory No. 10(b) & (c) (stating that they believed any detective with less than four years experience lacked sufficient experience to be assigned as a detective with supervisory authority over those with more years of service in the JCPD).

bility for promotion to detective. *See* Record at 682–83, 833 (Adams). Rather, the four-step scale upon which Adams based his program pertains to the schedule for compensating police officers and detectives.

According to Article XXXI of the collective bargaining agreement in effect from May 27, 1983 through January 1985, police officers were to receive compensation in accordance with the following schedule:

13. No provision of the collective bargaining agreement addresses the use of the four-step salary scale as a modality for determining eligi-

| Police Officer | 7/1/82 | 1/1/83 | 7/1/83 | 1/1/84 | 1/1/85 |
|---|---|---|---|---|---|
| 1st year | 15,800.00 | 17,095.60 | 17,521.35 | 19,010.66 | 20,151.30 |
| 2nd year | 18,578.00 | 20,101.39 | 20,602.00 | 22,353.16 | 23,694.35 |
| 3rd year | 20,178.00 | 21,832.59 | 22,376.31 | 24,278.29 | 25,734.99 |
| 4th year | 21,178.00 | 22,914.59 | 23,485.25 | 25,481.50 | 27,010.39 |
| Detective | 22,426.00 | 24,264.93 | 24,869.22 | 26,983.11 | 28,601.09 |

Under that agreement, police officers were also granted an annual longevity payment in accordance with the following schedules:

1. For the period July 1, 1982 to and including September 30, 1983:

| Beginning first day of year | % of Base pay | Through last day of year |
|---|---|---|
| 5 | 2 | 9 |
| 10 | 4 | 14 |
| 15 | 6 | 19 |
| 20 | 8 | 21 |
| 20 | 10 | each thereafter |

2. Commencing with October 1, 1983

| Beginning first day of year | % of Base pay | Through last day of year |
|---|---|---|
| 4 | 2 | 7 |
| 8 | 4 | 11 |
| 12 | 6 | 15 |
| 16 | 8 | 19 |
| 20 | 10 | 22 |
| 23 | 12 | each thereafter |

According to Article 33(A) of the agreement, entered January 30, 1985, police Officers were to receive compensation in accordance with the following schedule:

| | 1/1/85 | 7/1/85 | 1/1/86 | 7/1/86 | 1/1/87 | 7/1/87 |
|---|---|---|---|---|---|---|
| 1st year | 19,100 | 19,100 | 19,100 | 19,100 | 19,100 | 19,100 |
| 2nd year | 20,451 | 20,451 | 20,560 | 20,560 | 20,560 | 20,560 |
| 3rd year | 22,222 | 22,222 | 22,340 | 22,340 | 22,340 | 23,650 |
| 4th year | 23,994 | 23,994 | 23,994 | 23,994 | 24,990 | 24,990 |
| 5th year | 26,035 | 26,535 | 26,535 | 26,535 | 26,535 | 26,535 |
| 6th year | 27,310 | 28,110 | 29,310 | 30,510 | 29,610 | 29,610 |
| 7th year | | | | | 31,760 | 32,910 |
| Detective | 28,902 | 29,702 | 30,902 | 32,102 | 33,352 | 34,502 |

In addition:

1. Police Officers were to receive an annual longevity payment in accordance with the following schedules:

a. For the period January 1, 1985 to and including December 31, 1986:

| Beginning first day of year | % of Base Pay | Through last day of year |
|---|---|---|
| 4 | 2 | 7 |
| 8 | 4 | 11 |
| 12 | 6 | 15 |
| 16 | 8 | 19 |
| 20 | 10 | 22 |
| 23 | 12 | each thereafter |

applied the policy retroactively to those officers who lacked the four-year requisite experience. *Id.* at 683, 830–34. Adams implemented the program on his first day in office, without discussions with the Police Officers Benevolent Association ("POBA"). Adams stated, however, that prior to assuming his duties as Director, he discussed the program with Captains Frank Pajewski and Frank Sadler, Deputy Chief Carter, and Mayor Cucci. *Id.* at 683–84. Significantly, no written document exists that memorializes the four-year criterion upon which promotions to the rank of detective were allegedly to have been based after July 1, 1985. *Id.* at 683–84, 833.

He contended that since plaintiff failed to meet the four-year criterion, he was demoted and his salary was decreased in the amount of $1656.00. *See e.g. id.* at 636–37; Stipulation of Facts in Pretrial Order at 35. Plaintiff was apprised of his demotion on Adams' first day in office. Prior to this date Adams admits that he did

b. Commencing with January 1, 1987:

| Beginning first day of year | % of Base Pay | Through last day of year |
|---|---|---|
| 4 | 2 | 7 |
| 8 | 4 | 11 |
| 12 | 6 | 15 |
| 16 | 8 | 19 |
| 20 | 10 | 22 |
| 23 | 12 | 24 |
| 25 | 14 | each thereafter |

Finally the agreement provides that employees shall receive a service differential in accordance with the following schedules:

a. Commencing July 1, 1986:

| Beginning first day of year | % of Base Pay | Through last day of year |
|---|---|---|
| 5 | 1 | each thereafter |

b. Commencing January 1, 1987:

| Beginning first day of year | % of Base Pay | Through last day of year |
|---|---|---|
| 5 | 1 | 11 |
| 12 | 1.5 | 15 |
| 16 | 2.0 | each thereafter |

Applying the tables in effect at the time of plaintiff's promotion to the rank of detective in 1982, at which time he was apparently considered a fourth year officer, his annual salary increased from 21,178 to 22,498 and he received a longevity payment in the amount of $449.00. *See* Attachment A to plaintiff's Ex. 1.

In July 1985, plaintiff had six years of service on the force, and received a detective's salary in the amount of $29,707 plus a longevity payment in the amount of $1124. When he was demoted, he received the salary of a sixth year officer in the amount of $28,110 plus his longevity payment. *See id.*

According to John McGuire, Chief Fiscal Officer for the police and fire department for the City of Jersey City, plaintiff also earned overtime payments for the following years in the following amounts:

| | |
|---|---|
| 1981 | 1931.47 |
| 1982 | 3395.05 |
| 1983 | 4412.16 |
| 1984 | 6179.14 |
| 1985 | 4111.33* |
| 1986 | 0 |
| 1987 | 4356.34 (as a patrolman) |
| 1988 | 1080.63 (until 3/1/88 retirement) |

*(In July, 1985 plaintiff commenced vacation, immediately followed by a leave of absence that continued until July 30, 1986.)

Record at 1178–79, 1183, 1186–87 (McGuire); Defendant's Ex. 8. Both Director Adams and Mr. McGuire deny that detectives are guaranteed greater overtime than patrolmen, and state that the availability of overtime work, for a detective, depends upon a his assignment and for police officer, depends upon his arrest record. *Id.* at 1184–85; Record at 777 (Adams). The amount of an employee's overtime wage is based upon his base pay and longevity payment. Record at 1187 (McGuire).

McGuire testified that absent any overtime earnings, if plaintiff continued in the position of detective from July 1, 1985 until May 31, 1988, he would have earned $112,918.26. *Id.* at 1180–81; Defendants' Ex. 10. If he had served as a patrolman in the department from July 1, 1985 through May 31, 1988, he would have earned $107,425.70. Thus, these calculations, made as though he never took a leave of absence, reveal a pay differential of $5492.56. *Id* at 1181.

Factoring in his leave of absence, for the period of November 5, 1985 through July 29, 1986, plaintiff would have earned as a detective a total of $89,755.02, and as a police officer, $85,456.97. *See also* defendant's Ex. 10. The differential between the pay he would have received in the two posts equals $4298.05, for work he would have performed through May 31, 1988. *Id.*

not have access to plaintiff's personnel file, did not review same prior to ordering plaintiff's demotion, and admittedly determined that plaintiff fell below the four year experience requirement based only on his personal knowledge of plaintiff's tenure in the department. Record at 694–97, 806, 817 (Adams). Plaintiff's "individual work performance was not taken into consideration as a reason for his reassignment from detective to patrolman." Defendants' Response to Plaintiff's Interrogatory No. 3. See also Defendant's Response to Interrogatory No. 7 (stating that "a performance evaluation was not a factor in the decision to reassign the plaintiff...." In fact, the Director stated that he found plaintiff to have been a good officer. Record at 824, 828–29, 832 (Adams).

Despite assertions that plaintiff's demotion was based on his failure to meet the four-year criterion, I find that the inconsistency with which the standard had been applied casts grave doubt on the veracity of that explanation for plaintiff's demotion and, conversely, supports a conclusion that the criterion was mere subterfuge for the true reason for the personnel action. The record clearly reveals that Adams made "quite a few exceptions" [14] to the four-year criterion during the period following its implementation. Id. at 814. For instance, several officers, such as Officers Wolfe, Sabo, Camacho, and Sanchez, were initially demoted for failure to meet the four-year criterion, but were thereafter promoted to detective, albeit without the commensurate pay differential, before gaining the necessary experience to meet the four-year criterion. Id. at 641–45, 653–55, 769–73, 794, 811–14, 1262–71. Apparently, Adams believed that these assignments were consistent with his four-year criterion since these individuals did not receive additional salary see id. at 858–59, and hence these individual held "only" the status of unpaid detectives. While he stated that those with less

than four years experience were not entitled to a promotion as a "paid detective" [15], he admitted that the work that each type of detective performed and the authority each had was identical. When asked why he did not make a similar exception for plaintiff, Adams stated that he did not do so "because [he] knew [plaintiff] was going to another town to try another department" in California. Id. at 814. See Discussion infra.

In light of the inconsistency with which the criterion had been applied, I am persuaded that the four-year criterion was selected because defendant wanted to demote individuals who had been appointed during the McCann era, thereby prohibiting these individuals from obtaining the "perk" of tenure in the position of detective by amassing five years experience, see id. at 659, I find that the four-year criterion provides only a cover story, but did not reflect the true basis upon which defendants decided to demote plaintiff. The record clearly supports plaintiff's contention that he, and other McCann supporters were demoted because of their political affiliation with a losing candidate, Record at 116–20 (Perez, A.); Record at 1236–40 (Lopez); Record at 867 (Perez, J.), and that consistent with the "standard operating procedure" of city politics, the detective division became staffed with those who had supported the winning mayoral candidate. See Testimony of Benjamin Lopez at 1233–34. See also Record at 886 (Perez, V.) (stating that "Because I knew Abad was on the wrong side, he was going to get dumped.").

Following the demotion, Capt. Victor Perez approached Councilman Cunningham and Vazquez to see if plaintiff could be reinstated to the position of detective. Victor Perez stated that Vazquez was well aware of plaintiff's active support of McCann, and that in Vazquez's judgment, plaintiff had done "too many things" in

---

**14.** While Adams asserted that he made exceptions to the four-year criterion to maintain flexibility, including an ability to assign "fresh faces" to do undercover work, defendants do not contend that these factors played any role in either plaintiff's demotion or their failure to make an exception to the four-year criterion for him.

**15.** In September, 1988 the Mayor rescinded the 1988 abolishment of a pay differential between detectives and patrolmen. Record at 837–39 (Adams).

support of the losing candidate such that "he could not be helped." Record at 887–89 (Perez, V.). *See also id.* at 890 (reporting that Councilman Cunningham recommended that plaintiff "serve a penance" and "lay low for a few months" prior to reentering the ranks).

According to documents that pertain to the terms and conditions of employment, plaintiff was entitled to forty-eight hours notice of his change of assignment prior to the start of same "whenever possible to do so." [16] *See* Article 24 of the collective bargaining agreement between the City of Jersey City and the Jersey City Police Officers Benevolent Association. Further, his reduction in status must have been for "just cause." *See* Rule 723 of the Rules and Regulations Manual (effective in 1985), which provides:

> Any permanently employed officer or employee who receives a fixed annual salary from the municipality shall not be ... reduced from office or employment therein except for just cause and then only after written charges and complaint shall have been preferred [sic].

*See also* Record at 711–12, 723 (Adams) (explaining that the Rules apply to plaintiff, and acknowledging that plaintiff received a fixed salary from the municipality). In addition, pursuant to departmental rules,[17] plaintiff was entitled to certain procedural protections, such as presentation of a written complaint, or notice of the grounds for the personnel action. *See e.g.* Rule 725. The rules further provide that absent a hearing on the complaint, the employee must be reinstated to the position from which he had been removed. *See* Rule 728. The fact no one else received a hearing following removal, does not excuse defendant's apparent noncompliance in

plaintiff's case. Record at 715, 1261 (Adams). Defendants' failure to comply with the provisions of these rules, and in particular their failure to articulate a just cause for plaintiff's demotion, *id.* at 681–82, undermines the truthfulness of the rationale offered to explain plaintiff's demotion. The absence of the true explanation is of no moment, however, since the reality was that plaintiff was a victim of the spoils system—his demotion was based on his failure to support the victor, to whom the so-called "spoils" belonged.

As a result of his demotion, and instructions to turn in his shield, plaintiff submitted the following memorandum:

> FROM: Detective Abad Perez File #
> TO: Chief of Police John Fritz Date July 3, 1985
> SUBJECT: Demotion—To Police Officer
> Sirs:
> This is to advise you that I am surrendering, (as ordered by Lt. Healey) my Detective Shield # 78, under official protest.
> s/
> Respectfully,
> Detective Abad Perez # 78

cc: Director Walter Adams Public Safety
*See* Plaintiff's Ex. 34. *See also* Record at 81 (Perez, A.). Adams admitted knowledge of plaintiff's protest in July, 1985. *See* Record at 815 (Adams). Prior thereto, by memorandum dated July 2, 1985, plaintiff filed a grievance regarding his demotion with Ron Buonocore, POBA President, informing Mr. Buonocore that:

> I am formally filing a grievance with our Union and request that they represent me in this action. On July 2nd, 1985 I was called by Lt. Healy (Deputy Chief's Office) and told to respond on July 3rd,

---

**16.** Apparently plaintiff received notice of the change of assignment on the same date it was effective, and thus, defendants may have technically violated this provision of the collective bargaining agreement. *See* Plaintiff's Ex. 33; Defendant's Ex. 1; Record at 1006 (Healy); Record at 695 (Adams).

**17.** While the position of detective may not be a civil service rank pursuant to which the state statutory procedures governing civil service applies, defendants admit that all officers are sub-

ject to the civil service rules embodied in the administrative code, as well as all applicable city ordinances. *See* Defendant's Response to Plaintiff's Interrogatory No. 22(a) & (b). Moreover, departmental management has exercised its discretion to create additional steps in the hierarchy pursuant to which departmental procedures apply, which in this case include notice, hearing and the existence of just cause for removal. Record at 716 (Adams); Rule 723.

1985 to Chief Fritz's Office to turn in my Detective Shield # 78.

On July 3rd, 1985 I responded to Chief Fritz's Office (with my attorney) and turned in the Detective Shield, along with an official protest. The demotion to Police Officer was improper and I request that the Union do all they can on my behalf. If the Union has an "Official" stand on the issue of demotion I would like to have it in writing.

> Respectfully,
> s/ Abad Perez
> P.O. Abad Perez # 2121

*See* Plaintiff's Ex. 35, at 2. Mr. Buonocore then notified late Chief of Police John Fritz, by letter dated July 8, 1985, of plaintiff's grievance:

To: Chief of Police
 John Fritz

DATE: July 8, 1985

EMPLOYEE'S NAME: Abad Perez SHIELD#: 2121 and all other Det's UNIT: N/A TITLE: P.O. that it may effect.

NATURE OF GRIEVANCE: Whereas, the City of Jersey City has violated the contractual agreement between the Jersey City Police Officers Benevolent Association and the City of Jersey City by demoting Abad Perez and other Detective's without just cause to the rank of Police Officer.

CONTRACT VIOLATION: Article XXXIX, II, IV, and any and all other articles, State Statues [sic], Civil Rights and violations that may apply.

SIGNATURE OF AGGRIEVED: Attached.

SIGNATURE OF POBA PRESIDENT s/ Ron Buonocore
Ron Buonocore
C.C. Mr. David Solomon, Esq.
 P.O. Abad Perez
 Director of Labor Relations, Lou Ippolitto

Plaintiff's Ex. 35.

Moreover, by letter dated September 30, 1985, the Claims Administrator of the City of Jersey City received a copy of plaintiff's notice of claim for damages against the City. *See* plaintiff's Ex. 36. In his notice, plaintiff specifically delineated the action that gave rise to his claim (*i.e.*, demotion from detective to patrolman without explanation or cause) and those who plaintiff alleged to have been at fault (*i.e.*, Director Walter Adams, late Chief of Police John Fritz, then-Lieutenant Edwin Healy, Councilmen Glenn Cunningham and Jaime Vazquez, and Mayor Anthony Cucci).

Thus, while defendants assert that they were unaware of plaintiff's claim that he was unlawfully demoted until September, 1986, the above reflects that municipal officials were notified of plaintiff's displeasure immediately after his demotion and thus well before the date upon which plaintiff instituted the present civil rights action. Despite such notice, defendants never investigated his claim.[18] *See e.g.* Record at 814–24 (Adams); Record at 929–30, 946–47 (Cucci).

Following his demotion, on or about July 22, 1985, plaintiff commenced employment with the Los Angeles Police Department ("LAPD") while categorized as on vacation from the JCPD. Apparently, in 1976, prior to his employment with the JCPD, plaintiff applied for a position with the LAPD. Record at 134, 209–10 (Perez, A.). In 1982, plaintiff received an offer, which he declined because he was satisfied with his position in JCPD. *Id.* at 134. In April, 1985, plaintiff contacted the LAPD while on a visit to California to determine whether or not his application was still valid. *Id.* at 210–11. He was informed that it was and, thereafter, in July of that year, he received a letter from the LAPD in which he was invited to join a new training class that was scheduled to begin on July 22, 1985. *Id.* at 210–11. Thus, after his July 1, 1985 demotion, he left Jersey City and joined the LAPD.

By memorandum dated October 28, 1985, plaintiff, who at that point had practically depleted his accumulated vacation time, re-

---

**18.** Defendant Adams admitted that he knew of Lt. Healy's statement to plaintiff that "the axe has fallen", but did not investigate the remark. Record at 678–79 (Adams).

quested a leave of absence from the Jersey City Police Department:

> ... to determine if I will return or retire from the department. This is based on the fact that I was unlawfully demoted to the rank of patrolman.

Plaintiff's Ex. 5. He was granted such a leave, and remained with the LAPD until July, 1986, using the vacation time he had accumulated and the period of this leave of absence. Plaintiff testified that in mid–1986 he sought to return to the JCPD because he was on the sargeant's list and hoped that he "did enough penance" to return to the force. Record at 136–37 (Perez, A.). All of these factors demonstrate that while his demotion apparently coincided with the receipt of the invitation to join the training class for the LAPD, and his decision to move may have been made easier, and in this way may have been connected with the demotion, I do not find that plaintiff was forced to leave the JCPD. I so conclude because on July 30, 1986, plaintiff returned from his leave of absence and resumed service as a patrolman in the JCPD at a salary of seventh year officer and remained on active duty until March 1, 1988, on which date he began a paid sick leave, which he claims was the result of job-related stress.[19] He continued on paid sick leave until his retirement on June 1, 1988. *Id.*

Before reaching my conclusions of law, I shall highlight portions of the testimony of the key players and enter my credibility findings.

### F. Key Players.

#### 1. ABAD PEREZ

Mr. Perez testified that as a uniformed police officer he had supported the 1981 candidacy of Gerald McCann. In response to the question, "so he gets elected and you became a detective?," he answered, "That's correct." He described the position of detective as "prestigous" with numerous advantages, financial and otherwise. Thus, it was clear to me that he used his membership in and position as President of the Hispanic Law Enforcement Society to promote its goals and himself, through his support of McCann. The evidence indicates that his highly publicized political embrace of McCann's candidacy in 1981 and 1985, however, ultimately proved to have dire consequences for him at the hands of Mayor Cucci and his chief supporters.

Apparently the plaintiff was viewed as a Judas within certain segments of the Hispanic community that had thrown in their lot in support of Cucci. Councilman Vasquez made this abundantly clear during his testimony (*see infra*). Relatedly, after being present at a particularly volatile con-

---

**19.** Plaintiff asserts that in 1987 he first began to experience chest pain and headaches. Record at 149 (Perez, A.). Significantly, these conditions occurred more than one year after his return from the LAPD.

Plaintiff first sought psychiatric treatment on March 7, 1988, allegedly because of depression, anxiety, and a sleep disturbance. Record at 723 (Ferretti). He visited Dr. Ferretti on eight occasions from March, 1988 through July 1988. Each visit lasted thirty to forty-five minutes. *Id.* at 727–28. Ferretti described plaintiff as a nonpsychotic, depressed, and anxious individual, whose symptoms were related to job stresses. *Id.* at 724. *See also* Plaintiff's Ex. 9.

The critical question is whether the conditions were the result of defendants alleged unconstitutional conduct. Several factors indicate that any emotional distress that plaintiff suffered was not the result of this conduct. First, plaintiff sought treatment in March of 1988, more than two and one-half years after the events at issue. He did not seek any such help prior to that time. Second, he left the JCPD in July,

1985 to assume a position with the LAPD. Plaintiff does not dispute that he was able to function as an officer with the LAPD in an efficient manner. Third, during the period between July, 1985 and March, 1988, plaintiff experienced several stressful events that were unrelated to defendants' conduct. For instance, plaintiff sat for the state bar examination more than once, went through a divorce, and apparently sought to be reunited with a child he had not seen in several years. Record at 1150 (Effron), 1150. Finally, the record indicates that plaintiff was able to resume service in the JCPD for more than one year after his return from California and has engaged in the practice of law. *Id.* at 1151, 1159. *See also* defendant's Ex. 6, 7. For these reasons, I seriously doubt that defendants conduct has caused severe emotional distress. I find plaintiff to be competent, cooperative, and intelligent, *accord* defendant's Ex. 7; Record at 1148 (Effron), and the evidence demonstrates that the defendants' conduct during the 1985 election did not cause any distress for which he sought attention in 1988.

frontation between McCann and Cucci supporters, plaintiff filed a police report which attributed to Councilman Vasquez the following statement: "Once we are elected we are going to take those traitors who McCann made detectives, those Hispanic detectives and take their gold badges away from them and put them in uniforms and have them walk a beat, so that they learn their lessons."

Perez testified that Mayor Cucci was sworn in on July 1, 1985. On that same day, plaintiff received a call from a Lieutenant Healy who instructed him to go to the Chief's Office and "surrender [his] detective badge and pick up the patrolman's badge". According to the plaintiff, Healy said "The axe has fallen." I asked him, "How did you interpret that?" He said: "Well that ... they were cutting my head off because I was a McCann supporter. That was my understanding of it."

In his recitation of his rise and fall, in the main I found the plaintiff to be a credible witness. I was less impressed with his recitation of events relating to his post-demotion activities, particularly relating to his move to California and his emotional reaction to his firing. Further, I have no doubt that he was politically street-wise and probably knew that his actions would bring dire consequences. However, the constitution does not only protect the naive.

### 2. JAIME VASZQUEZ

Councilman Vazquez was elected to office on May 14, 1985. When I asked him whether he had the power to dispense patronage he replied in part:

Police department is a lot different because you have a union to the contract. And it might politically naive, your Honor, I know that you have heard a lot from the Mayor and from both sides, and I want to say to you that to some people it might sound politically naive because some people expect you to produce politically, but I never ever had a conversation with Walter Adams or the Mayor about the promotion or demotion of any detective in the Jersey City Police Department. . . .

\* \* \* \* \* \*

. . . that's not my style of politics.

\* \* \* \* \* \*

. . . I consider myself a just man. But Officer Perez was a very extremist supporter of McCann.

Q. You mean the plaintiff here?

A. Yes. Harassing our workers, intimidating our workers and our supporters and using his position as a police officer and his authority as police officer and his badge to accomplish his political goals.

Now, I don't mind a person exercising their political right. One of my beliefs, when I've flunked constitutional law when I was in college ... having gone through this course twice, I learned to appreciate that Constitution more.

I don't mind a police officer exercising [his] right to become politically involved in a campaign but I do object very strongly to a person using [a] political position to harass, intimidate and attempt to disenfranchise a group of people who are trying to exercise their constitutional rights also.

Q. Did you find it—assuming what you say is true, did you find it ironic a police officer who is Hispanic was doing this to, from what I gather, to Hispanics?

A. Your Honor, whatever I can say here is either based on my own personal knowledge or on my knowledge from other people.

Officer Perez is one of the most disliked people. No other police officer would serve as his partner. He had to be assigned to his own car by himself because people knew he was very, very extremist while he was on duty.

It's embarassing to a certain extent. The police department won't say it, but the code of silence and brotherhood, they have to protect each other. Officer Perez has a very long track record in the community of assaulting people, and it's well-known. That's why he was having his problems. And I observed him on certain occasions and the way he acted.

[For instance] ... a woman had Officer Perez draw his weapon on Mr. D'Alessandro because Mr. D'Alessandro didn't have a license plate on the front of his car when Officer Perez was off duty, is the kind of example of the kind of thing he would do as a police officer.

But it is a well-known fact from among the Jersey City Police Department that Abad Perez was not a good police officer, he was not well-liked, he endangered the lives of ... other police officers by acting the way he did. If he stopped 15 people, he wanted to arrest 15 people. That's the kind of person he was.

And during this campaign, he directed himself toward us. He never was for the Hispanic community. I think it was Mario Benitez that showed ... his badge ... to Joe Gonzalez at the river. And Joe Gonzalez related back to me two or three years ago, when he occurred. He had been arrested for drunken driving and taken to the precinct. When Officer Perez came in, he got in some sort of discussion with Officer Perez and hurt Joe Gonzalez.

So he had a long track record of this kind of action. Being a police officer, exercise your right, but don't abuse people like that. I very much object to that.

Despite these allegations, the record indicates that the plaintiff was not charged with the sort of conduct of which Mr. Vasquez accused him.

The evidence is compelling that the witness felt strongly about the plaintiff and regardless of what grade he ultimately received in constitutional law, his actions alone and with others, in sanctioning Perez, reflects insufficient appreciation of constitutional values. I would flunk him again. His testimony left a lot to be desired.

### 3. ANTHONY R. CUCCI

I found the Mayor to be a very engaging personality. He professed no knowledge of any list of Jersey City police officers marked for retribution. He said he knew what had happened in 1981 under the McCann regime, but had no knowledge of the "ax falling" on Perez. In this regard, he said "there's a big difference between Gerald McCann's philosphy of administration and mine.... I have absolutely no knowledge of this incident. None whatsoever. I have no part in it. I would not have any part in it." He contended that Director Adams had complete discretion to act with respect to Jersey City police officers and specifically, he denied telling Adams "what he should do and should not do."

During the trial I asked him if he was "aware, while you were campaigning, that the plaintiff in this action was an avid supporter of your opponent, sir?" He answered: "No, I paid no—I paid no attention. I did not." He further stated: "I'm not going to be blemished, I'm not going to be stigmitized that I'm part of the old system. I proved I'm not from the very first day and prior to my winning."

On cross-examination he was asked:

Q. It was your policy not to take care of anybody, whether negatively or positively, because of their support or non-support of your candidacy, correct?

A. That's correct.

\* \* \* \* \* \*

... I never ordered anybody to be punished on the police department. I have never, never done that.

In answer to a series of questions that I put to him, Mayor Cucci conceeded:

1. that it was conceivable that others in his administration had punished the faithless without consulting him, and

2. that he may have been "remiss" in not instructing his staff that reprisal policies were not to be condoned.

While I believe that the Mayor never gave a direct order to demote the plaintiff for political reasons, I find what he did do was to stay above the fray, knowing that others in his administration were committing political carnage in the police department in violation of law. He saw, heard, and knew what was going on but he adopted a "hands-off" policy. Hence, by his silence he acquiesed in the actions of others.

His attempt to pursuade the court that a new breeze blew into the city hall on July 1, 1985, purging the body politic of pernicious practices affecting the Jersey City Police Department, is unavailing. The air was fetid. It was sadly, business as usual in Jersey City.

### 4. WALTER ADAMS

As noted previously, Walter Adams is presently Chief of Police. He had been appointed Director of Public Safety on July 1, 1985.

He characterized the plaintiff's transfer to the uniformed ranks in July 1, 1985 as being a "reassignment," rather than a demotion.

While he personally did not perceive any real advantage in the position of a uniformed officer over a plainclothes detective, he conceeded that affected police officers believed that the extra money and "freedom to move around," made the job, comparitively speaking, more prestigous.

He explained his "reassignment" of Perez and others was because an officer with less than four years experience as a patrol officer did not have the necessary experience to justify the salary of a *paid* detective with respect to the duties of a paid detective, his testimony reveals:

Q. Does a paid detective do work that is substantially different from the work that an otherwise unpaid detective does?

A. No he does not.

Q. Same exact work.

A. That's correct.

In light of this, and other testimony, I find that Adams' purported rationale for the implementation of the four-year criterion is seriously flawed and unpersuasive.

As I have concluded elsewhere, the engine of politics propelled this course of action.

Director Adams struck me as a decent professional who had devoted almost a quarter of a century in the service of the city's police force. He came up through the ranks. He had not been a fierce Cucci partisan. In fact, his activity in this regard had been relatively sparse. From the evidence it appears that his political sponsor had been Council President Glen Cunningham.

I had the distinct feeling that in July, 1985, Adams was thrust into a position for which he may have been professionally prepared, but *not* politically. He described it as "a nutty time". I find that he was deluged with political requests from his benefactors, one of which had a highly adverse effect on Abad Perez. One can appreciate this dilemna and his desire to carry on his duties in a professional manner while not being ungrateful to the political piranhas. But weighing Mr. Perez's constitutional rights against Chief Adams' discomfort does not permit me to view his actions with approbation.

### 5. MARIO BENITEZ

Mr. Benitez is a disappointed job seeker who actively campaigned for Mayor Cucci in 1985.

The main points of his testimony were:

1. That during the campaign he had been at the Cucci Association headquarters;

2. While there he had observed Cucci, Vasquez, Adams, a state trooper named Juan Perez, Ben Lopez and Walter Adams;

3. He had seen a list with plaintiff's name on it and that Vazquez said plaintiff and those on the list "were to be taken care of" after the election;

4. That Cucci had orally confirmed that retribution would take place; and

5. After the run-off election, Councilman Vasquez had displayed Perez's gold badge as proof that he was now "walking a beat."

The witness obviously had an axe to grind. But accounting for his bias, Mr. Benitez has convinced me that points 1, 2 and 3 were true. I am not persuaded, however, of the truthfulness of points 4 and 5.

### 6. BENJAMIN LOPEZ

Mr. Lopez, a former councilman, is Business Administrator for the City of Jersey City.

Mr. Lopez was a very intelligent witness who steadfastly denied any knowledge of why Perez had been demoted, the practice of patronage itself, insofar as it impacted on McCann supporters in the JCPD in 1985, or the existence of any "hit list."

He testified that signing the CS–6 form, which formally returned Perez to the uniformed ranks was something so mundane that he could not recall doing it. He claimed that as a member of candidate Cucci's inner council he confined himself prior to the May election to "evaluating the results of the debates, what occurred at those debates, the extent of how the literature either was being produced and put out, the need for people to be out there distributing our literature, what kind of human relations work needed to be done. That kind of discussion."

Even after the May election he denied having any knowledge of or discussing a list of McCann supporters that appeared in an advertisement in the Jersey Journal. He said "it wasn't cogent to our discussions."

Mr. Lopez's testimony strained my credulity. A consumate insider, he was rewarded handsomely by Mayor Cucci for his efforts. I find that he knew exactly what was going on with respect to the likes of Abad Perez. There is no doubt in my mind that when he affixed his signature to Perez's CS–6, making plaintiff's demotion retroactive to July 1, 1985, he knew exactly what he was doing and to whom he was doing it.

## III. CONCLUSIONS OF LAW

### A. *Section 1983 Claim*

Section 1983 provides that:

> Every person who, under the color of any statute, ordinance, regulation, custom or usage of any state, ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To state a claim for relief under § 1983, the conduct complained of must have been (1) committed by an individual or entity acting under the color of state law and (2) must have deprived the plaintiff of a right or privilege secured by the constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988); *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981); *Colburn v. Upper Darby Twnshp.*, 838 F.2d 663, 667 (3d Cir. 1988) *cert. denied*, — U.S. —, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989); *Riley v. Jeffes*, 777 F.2d 143, 145 (3d Cir.1985). In this action, plaintiff challenges the conduct of Mayor Anthony Cucci, Councilman Jamie Vazquez, City Business Administrator Benjamin Lopez and Chief of Police Walter Adams, all of whom are employees and/or officials of the City of Jersey City. Generally,

> ... a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.

*West, supra*, 108 S.Ct. at 2256. There is no doubt that personnel decisions within the JCPD are made "by virtue of state law," and that those who make such decisions are "clothed with the authority of state law." *Id.* Clearly, defendants are all public employees who had positions that influence city personnel decisions. Thus, consistent with the general rule, I find, and defendants do not dispute, that they are state actors. Hence, plaintiff has satisfied the first element of a claim under § 1983.

I now must determine whether or not defendants have committed acts that have deprived plaintiff of a right or privilege secured by the constitution or laws of the United States. Plaintiff claims that defendants have penalized him for exercising his right to free association and political expression, as guaranteed by the first amendment, and his rights to equal protection under the law as well as due process of law, as guaranteed by the fourteenth amendment.

1. First Amendment Claims.

a. *Introduction.*

The first amendment mandates that "Congress shall make no law ... abridging the freedom of speech ... or association ..." Judicial interpretation of this amendment makes:

... clear that the free speech mandate is no longer limited to statutes enacted by Congress; it is made obligatory on the states by the fourteenth amendment.

*Horn v. Kean,* 796 F.2d 668, 671 (3d Cir. 1986) (en banc), (quoting *Jacobellis v. Ohio,* 378 U.S. 184, 195, 84 S.Ct. 1676, 1682, 12 L.Ed.2d 793 (1964) (Black J. concurring)). Thus, first amendment prohibitions are triggered when some form of state power is exercised. *Horn, supra* at 672. In the case at bar, plaintiff asserts that defendants, in their capacity as city officials, made certain personnel decisions based upon plaintiff's exercise of his right to freedom of speech and association.

In *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983), the United States Supreme Court stated that the retention of public employment cannot constitutionally be conditioned upon a "basis that infringes the employee[']s constitutionally protected interest in freedom of expression." *See also Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (stating that the government

may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his ex-

ercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser v. Randall,* 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460] [ (1958) ]. Such interference with constitutional rights is impermissible).

■ Thus, retention of a public position does not require, and cannot be conditioned upon requiring, an employee to completely forego the exercise of his rights to freedom of speech and association. *Rode v. Dellarciprete,* 845 F.2d 1195, 1200, 1204 (3d Cir. 1988). I shall now examine the extent to which a public employee retains his right to exercise his right to free speech and association and the boundaries of permissible state restriction of these rights.

b. *Free Speech.*

■ With respect to the right to free speech, "[p]ublic employees retain their first amendment right to comment on matters of public concern," *Rode, supra* 1201, upon which free and open debate is vital to informed decision making by the electorate." *Pickering v. Board of Education,* 391 U.S. 563, 571–72, 88 S.Ct. 1731, 1736–37, 20 L.Ed.2d 811 (1968).[20] If the expression does not relate "to any matter of political, social or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." [21] *Connick, supra,* 461 U.S. at 146, 103 S.Ct. at 1690. Thus,

when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters

---

**20.** The issue in determining whether speech is protected focuses on whether the speech pertains to a matter of public concern. It is of no moment whether the expression occurred in a public or private forum. *See Connick, supra,* 461 U.S. at 148 n. 8, 103 S.Ct. at 16 n. 8; *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979).

**21.** The employee's personal stake in the substance of his speech is only one factor to consider in assessing the character of his speech. *See*

*Zamboni, supra,* at 78. Thus, while plaintiff's vigorous support of his candidate would have most likely operated to assure his continued employment as a detective had his candidate been successful, that factor alone does not require concluding that his expressions of support do not deal with matters of public concern. In fact, as the Court in *Connick, supra,* 461 U.S. at 148–49, 103 S.Ct. at 1690–91, observed, expression regarding political campaigns or conduct to participate in same indeed touches matter of public concern.

only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147, 103 S.Ct. at 1690. To demonstrate that a state employer has violated the first amendment's guarantee of freedom of speech, the public employee must first show he engaged in protected conduct, that is, he must show that his speech pertained to a matter of public concern. *Rode, supra,* at 1201. A determination of whether the speech at issue addresses a matter of public concern requires an examination of "the content, forum and context of a given statement, as revealed by the whole record." *Id.* (quoting *Connick, supra,* 461 U.S. at 148, 103 S.Ct. at 1691 (footnote omitted)). If plaintiff demonstrates he engaged in protected conduct, then he must next show that the conduct "was a 'substantial' or 'motivating' factor in the em-

ployer's [personnel] decision." *Rode, supra,* at 1200.

If the plaintiff demonstrates that he engaged in protected speech, and that this conduct was the motivating factor behind defendants' decision, then the court must examine any state-imposed restrictions on such expression by balancing:

... the interests of the [employee], as a citizen, in commenting upon matters of public concern [against] the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering, supra* 391 U.S. at 568, 88 S.Ct. at 1734 (1968); *Rode, supra,* at 1202. *See also Mt. Healthy City School Dist. Bd. of Education v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471 (1977) (quoting the *Pickering* balancing test). Of course, defendants' legitimate interest in promoting efficiency, integrity, and discipline may be outweighed by plaintiff's interest in public discourse.[22] *Rode, supra,*

---

**22.** In *Zamboni, supra* at 76–77 the court of appeals for the Third Circuit summarized the above principles as follows:

Nearly a century ago, in flatly rejecting a public employee's First Amendment claim, Justice Holmes wrote: '[A policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman.' *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517 (1892). Twentieth century jurisprudence has accorded public employees substantially more First Amendment protection than Justice Holmes contemplated. From *Pickering v. Board of Education,* 391 U.S. 563 [88 S.Ct. 1731, 20 L.Ed.2d 811] ... (1968), to *Connick v. Myers,* 461 U.S. 138 [103 S.Ct. 1684, 75 L.Ed.2d 708] ... (1983), to *Rankin v. McPherson,* [483 U.S. 378] 107 S.Ct. 2891 [97 L.Ed.2d 315] (1987), the Supreme Court has sought to prevent 'a State [from] condition[ing] public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.' *Connick,* 461 U.S. at 142 [103 S.Ct. at 1687]. On the other hand, because the state may have an interest as an employer in regulating the speech of its employees, the judicial task is to strike a 'balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of State, as an employer, in promoting the efficiency of the public services it performs through its employees.' *Pickering,* 391 U.S. at 568 [88 S.Ct. at 1734]....

Accordingly, the threshold inquiry is whether plaintiff's speech is protected, which first

entails a determination of whether his expressions may be 'fairly characterized as constituting speech on a matter of public concern,' *Connick,* 461 U.S. at 146 [103 S.Ct. at 1689] ... because when a public employee speaks 'upon matters only of personal interst, absent the most unusual circumstances, a federal court is not the appropriate forum' for review. *Id.* at 147 [103 S.Ct. at 1690].... Whether the speech is on a matter of public concern is a legal determination, to be 'determined by the content, form, and context of a given statement, as revealed by the whole record.' *Connick,* 461 U.S. at 147–48 & n. 7 [103 S.Ct. at 1690–91 & n. 7] ... (footnote omitted). *See generally* Parker, *Free Expression and the Function of the Jury,* 65 B.U.L.Rev. 483, 510–24 (1985).

\* \* \* \* \* \*

[If the speech is protected], [i]t then becomes necessary to ascertain whether plaintiff's speech caused such interference with 'the effective functioning of the public employer's enterprise' as to justify the action taken in response. *Rankin,* 107 S.Ct. at 2898–99. This balancing, required by *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734, is also a legal determination. *See Pennekamp v. Florida,* 328 U.S. 331, 335 [66 S.Ct. 1029, 1031, 90 L.Ed. 1295] ... (1946) ('we are compelled to examine for ourselves the statements in issue and the circumstances under which they were made to see whether or not they ... are of a character which the principles of the First amendment ... protect'); *see also Rankin,* 107 S.Ct. at 2897.

at 1202. Additionally, in *Zamboni v. Stamler,* 847 F.2d 73, 78 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988), the Appellate Court added a further element for consideration: that if plaintiff shows that his speech involved a matter of public concern, defendant may place limitations on it only if defendant shows the speech has caused an "actual disruption." *Id.* at 78. But finding of actual disruption:

> ... while necessary, is not sufficient to a determination that the employee's speech is not protected. As [the court stated in *Czurlanis v. Albanese,* 721 F.2d 98, 107 (3d Cir.1983)]:
>
> '[t]he First Amendment balancing test [of *Pickering*] can hardly be *controlled* by a finding that disruption did occur.... The point is simply that the balancing test articulated in *Pickering* is truly a balancing test, with office disruption or breached confidences being only weights on the scales.' 721 F.2d at 107 (*quoting Porter v. Califano,* 592 F.2d 770, 773–74 (5th Cir.1979)).

*Id.* In evaluating a case to see if an actual disruption occurred, the court should consider plaintiff's role in the community, whether his conduct affected his working relationship, and if there is evidence that his conduct caused any unrest. *Id.* at 79.

■ If the plaintiff proves that his speech was protected, and if the defendant fails to show that the speech has caused an actual disruption, and if the plaintiff shows that his participation in the protected activity was a substantial or motivating factor in the actions taken against plaintiff, then the court must determine if defendant has shown " 'by a preponderance of the evidence that [it] would have reached the same decision as to [plaintiff's] employment even in the absence of the protected conduct." *Mt. Healthy, supra,* 429 U.S. at 287, 97 S.Ct. at 576; *Zamboni, supra,* at 79 n. 6. Applying this multiple-part test to the facts of this case, I find that defendants have violated plaintiff's right to free speech.

First, the record clearly demonstrates that plaintiff vigorously and openly expressed his political support for former Mayor McCann. Political expression in support of a candidate and/or his policies is at the heart of the first amendment and is entitled to constitutional protection as it involves a matter of public concern; in this case, the election of Jersey City's mayor.

Second, there is no doubt that plaintiff's support of Gerald McCann was a substantial factor in defendants' decision to demote him from the rank of plainclothes detective to uniformed patrolman. This conclusion is based in part on the fact that historically, the department has served as a political arm through which rewards for political support were granted and penalties for political opposition were imposed. The testimony clearly reveals that politically based demotions and promotions through the detective and uniformed ranks in the JCPD typified post-election personnel decisions in the department. Assertions that the system ceased at the time Mayor Cucci assumed office defies belief. In fact, as recently as May, 1988, the DePascale Committee reported that the presence of political pressure existed in the department and that change was needed.

Not only does the record support a finding that the city politics had a general influence on decisions within the JCPD, but the evidence also shows that such considerations motivated the plaintiff's demotion. Defendants knew that plaintiff actively supported the McCann ticket and indeed admitted that he was a highly visible supporter of McCann's election effort. In addition, Cucci supporters frequently discussed the identities and tactics of individuals who supported the opposition candidate. In this regard, campaign workers were instructed to report police harassment so that the Cucci camp could keep tabs of when "police officers acting on behalf of the McCann campaign used their authority as police officers...." to advance their political views. Through such reports, the officers were blacklisted in anticipation that those officers on the list would be sanctioned for their politically based conduct in the form of less pleasant, and presumably less prestigious assignments.

Sanctions were indeed imposed on the very first day the Cucci administration assumed office. Plaintiff, an officer who Cucci supporters described "as a person who could not be trusted," and with whom close Cucci advisors "were annoyed," was demoted from detective to patrolman, without reference to his good performance or even a review of his personnel file. This sequence of events, both prior to and following his demotion, support a conclusion that plaintiff's political expression was a motivating factor in defendant's personnel decision.[23]

Third, defendants have not alleged that plaintiff's political expression in support of McCann disrupted the work place or his work relationship with other members of the JCPD. In fact, Defendant Adams admits that plaintiff always served the JCPD in a competent manner. Defendants also state that plaintiff's performance played no role in the personnel decision. Furthermore, despite claims that he harassed Cucci supporters, there is no evidence that his support of McCann influenced his ability to carry out his job. Thus, defendants have not shown that their subsequent sanction of plaintiff's political expression promoted the efficiency of the public service the JCPD provides.

Finally, defendants have not proven by a preponderance of the evidence that they would have reached the same personnel decision even if plaintiff had not engaged in protected political conduct. Although they assert that plaintiff had been demoted pursuant to the four-year criterion, the fact that (1) this criterion was never memorialized in writing or discussed with the Union, (2) it was applied in an inconsistent manner, (3) plaintiff was demoted without review of his personnel file, (4) defendants failed to offer plaintiff the opportunity to return the rank of detective without a pay increase, as they had done for other employees, and (5) the inference that the adoption of a four-year time period was aimed at ousting offi-

cers who made detective at the time McCann was elected and thereby deprive them of tenure, undermine defendants' claim that this four years was the basis upon which plaintiff was demoted. For all of these reasons, I find that the four-year criterion was mere subterfuge for the true reason for plaintiff's demotion: his vigorous and open political support for the losing candidate.

Hence, as plaintiff has proven that he engaged in protected conduct which was a motivating or substantial factor in his demotion, and as there is no dispute his conduct did not cause an actual disruption in the work place nor is there an assertion that the demotion in response to the conduct advanced the public service the department provides, and as defendants have failed to prove by a preponderance of the evidence that they would have demoted plaintiff even in the absence of his exercise of his first amendment right to free speech, I find that all four defendants have engaged in conduct that deprived plaintiff of a constitutional right, and as state actors, have violated 42 U.S.C. § 1983.

### c. Freedom of Association.

■ The first and fourteenth amendments also protect an individual's right to exercise freedom to associate with others for the common advancement of political beliefs and ideas. *Kusper v. Pontikes*, 414 U.S. 51, 56–57, 94 S.Ct. 303, 307–08, 38 L.Ed.2d 260 (1973). *See also Lyng v. International Union, UAW*, 485 U.S. 360, 108 S.Ct. 1184, 1190 n. 5, 99 L.Ed.2d 380 (1988) (reviewing decisions in which the Court held that individual associational rights must be free from governmental interference). The right to associate with the political party of one's choice and support its platforms and candidates is an integral part of this basic constitutional freedom. *Kusper*, 414 U.S. at 57, 94 S.Ct. at 308. Pressure upon public employees to support particular political candidates, not

---

**23.** Defendant Adams' claims that he was unaware of plaintiff's political preference at the time he decided to demote plaintiff is questionable, not only because plaintiff's support for McCann was published in the local newspapers, but also because Adams stated that while he did

not have knowledge of plaintiff's political preferences, he knew the amount of experience plaintiff had in the department, whose membership is over 100, without looking at plaintiff's personnel file. Record at 695, 702–03 (Adams); Record at 32 (Perez, A.).

of the individual employees own choice constitutes a coercion of belief in violation of the first amendment.[24] *Connick, supra,* 461 U.S. at 149, 103 S.Ct. at 1691. It is on this basis that the Supreme Court has held that the first amendment rights of nonpolicy making public employees are violated if these types of employees are dismissed solely because of their political affiliation. *See Branti, supra; Brown v. Trench,* 787 F.2d 167, 168 (3d Cir.1986). For example, in *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the Supreme Court held that political association alone could not, consistently with the first amendment, constitute an adequate ground for denying public employment. Relatedly, in *Perry, supra,* 408 U.S. at 597, 92 S.Ct. at 2697, the court rejected the validity of limitations on first amendment rights as a condition to the receipt of governmental benefits.

In *Elrod,* the Supreme Court examined whether a politically motivated discharge of employees of the County Sheriff's office comports with the first and fourteenth amendments. *Elrod, supra,* 427 U.S. at 352, 96 S.Ct. at 2679. Like Jersey City, the county sheriff's office under scrutiny in *Elrod* had a practice of dismissing employees on a partisan basis and placing loyal supporters in government jobs.

Prior to the examining the constitutionality of this practice, Justice Brennan, speaking for the plurality in *Elrod,* reviewed the use of patronage in the United States.

Patronage practice is not new to American politics. It has existed at the federal level at least since the Presidency of Thomas Jefferson, although its popularization and legitimation primarily occurred later, in the Presidency of Andrew Jackson. The practice is not unique to American politics. It has been used in many European countries, and in darker times, it played a significant role in the Nazi rise to power in Germany and other totalitarian states. More recent times have witnessed a strong decline in its use, particularly with respect to public employment. Indeed, only a few decades after Andrew Jackson's administration, strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act, the foundation of modern civil service. And on the state and local levels, merit systems have increasingly displaced the practice. This trend led the Court to observe in *CSC v. Letter Carriers,* 413 U.S. 548, 564 [93 S.Ct. 2880, 2889, 37 L.Ed.2d 796] (1973), that 'the judgment of Congress, the Executive, and the country appears to have been that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences.'

The decline of patronage employment is not, of course, relevant to the question of its constitutionality. It is the practice itself, not the magnitude of its occurrence, the constitutionality of which must be determined. Nor for that matter does any unacceptability of the practice signified by its decline indicate its unconstitutionality. Our inquiry does not begin with the judgment of history, though the actual operation of a practice viewed in retrospect may help to assess its workings with respect to constitutional limitations. *Compare Brown v. Board of Education,* 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] (1954), with *Plessy v. Ferguson,* 163 U.S. 537 [16 S.Ct. 1138, 41 L.Ed. 256] (1896). Rather, inquiry must commence with identification of the constitutional limitations implicated by a challenged governmental practice.

*Id.* 427 U.S. at 353–55, 96 S.Ct. at 2680–81. Continuing, Justice Brennan asserted that the practice of political patronage restrains freedom of belief and association, since it requires an individual to maintain certain political affiliations to preserve his employ-

---

**24.** The first amendment protects a public employee from discharge based on both what he says and what he believes. *Branti, supra,* 445 U.S. at 515, 100 S.Ct. at 1293.

ment status.[25] *Id.* at 355–56, 96 S.Ct. at 2680–81. Moreover, the free functioning of the electoral process also suffers since "[c]onditioning public employment on partisan support prevents support of competing political interests." *Id.* at 356, 96 S.Ct. at 2681. All of these concerns are central to those activities that the first amendment protects. *Id.* As Justice Brennan wrote, *quoting, inter alia, West Va. State Bd. of Education v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943):

> [i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. *Id.*, at 642 [63 S.Ct. at 1187]. And though freedom of belief is central, '[t]he First Amendment protects political association as well as political expression.' *Buckley v. Valeo,* [424 U.S. 1, 15 [96 S.Ct. 612, 632, 46 L.Ed.2d 659] (1976)]. 'There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of "orderly group activity" protected by the First and Fourteenth Amendments. *NAACP v. Button*, 371 U.S. 415, 430 [83 S.Ct. 328, 336, 9 L.Ed.2d 405] [ (1963) ]; *Bates v. Little Rock*, 361 U.S. 516, 522–523 [80 S.Ct. 412, 416–17, 4 L.Ed.2d 480 (1960) ]; *NAACP v. Alabama*, 357 U.S. 449, 460–61 [78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958) ]. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.' *Kusper v. Pontikes*, 414 U.S. 51, 56–57 [94 S.Ct. 303, 307–08, 38 L.Ed.2d 260] (1973).

These protections reflect our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 [84 S.Ct. 710, 720, 11 L.Ed.2d 686] (1964), a principle itself reflective of the fundamental understanding that '[c]ompetition in ideas and governmental policies is at the core of our electoral process....' *Williams v. Rhodes*, 393 U.S. [23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968) ]. Patronage, therefore, to the extent it compels or restrains belief and association, is inimical to the process which undergirds our system of government and is 'at war with the deeper traditions of democracy embodied in the First Amendment.' *Illinois State Employees Union v. Lewis*, 473 F.2d [561] at 576 [ (7th Cir.1972) ]. As such, the practice unavoidably confronts decisions by this Court either invalidating or recognizing as invalid government action that inhibits belief and association through the conditioning of public employment on political faith. *Id.* 427 U.S. at 356–57, 96 S.Ct. at 2681–82. *See also Connick, supra*, 461 U.S. at 145, 103 S.Ct. at 1689, where the Court stated that:

> The explanation for the Constitution's special concern with threats to the right of citizens to participate in political affairs is no mystery. The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' *Roth v. United States*, 354 U.S. 476, 484 [77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498] (1957); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 [84 S.Ct. 710, 720, 11 L.Ed.2d 686] (1964). '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' *Garrison v. Louisiana*, 379 U.S. 64, 74–75 [85 S.Ct. 209, 215–16, 13 L.Ed.2d 125] (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the ' "highest rung of the heirarchy of First Amendment values," ' and is entitled to special protection. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 [102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215] (1982); *Carey v. Brown*, 447 U.S. 455, 467 [100 S.Ct. 2286, 2293, 65 L.Ed.2d 263] (1980).

**25.** Of course, an employee who provides campaign and/or financial support for a particular candidate who is in office does so at the risk of losing his position if his party loses. *Elrod, supra*, 427 U.S. at 355, 96 S.Ct. at 2680.

In light of the effects of the patronage system and the precedent set forth in *Keyishian* and *Perry*, Justice Brennan opined that:

> [P]atronage practice falls squarely within the prohibitions of *Keyishian* and *Perry*. Under that practice, public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party. The threat of dismissal for failure to provide that support unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise. The belief and association which government may not ordain directly are achieved by indirection. And regardless of how even-handedly these restraints may operate in the long run, after political office has changed hands several times, protected interests are still infringed and thus the violation remains.

*Elrod, supra,* 427 U.S. at 359–60, 96 S.Ct. at 2682–83 (footnote omitted). For these reasons, he concluded that:

> ... patronage dismissals severely restrict political belief and association. Though there is a vital need for government efficiency and effectiveness, such dismissals are on balance not the least restrictive means for fostering that end. There is also a need to insure that policies which the electorate has sanctioned are effectively implemented. That interest can be fully satisfied by limiting patronage dismissals to policymaking positions. Finally, patronage dismissals cannot be justified by their contribution to the proper functioning of our democratic process through their assistance to partisan politics since political parties are nurtured by other, less intrusive and equally effective methods. More fundamentally, however, any contribution of patronage dismissals to the democractic process does not suffice to override their severe encroachment on First Amendment freedoms. We hold therefore, that the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments.[26]

An employee who claims:

> ... that adverse employment action was taken against [him] based upon the exercise of [his] associational rights must show that [he was] engaged in protected conduct, [and that the] conduct was a 'substantial' or 'motivating factor' in the government employer's decision.

*Rode, supra,* at 1204. Thus to demonstrate a violation of the first amendment in this context, plaintiff bears the burden of proving: (1) that he is a public employee, *see Horn, supra,* at 669, (2) that he was engaged in protected conduct, such as maintaining an affiliation with a particular political party, and (3) that his political affiliation was a substantial or motivating factor in the state actors' personnel decision.[27] *Laskaris v. Thornburgh,* 733 F.2d

---

**26.** I note that in *Loughney v. Hickey*, 635 F.2d 1063, 1065–71 (3d Cir.1980) and *Horn v. Kean,* 796 F.2d 668, 671–73 (3d Cir.1986), Judge Aldisert has criticized the result and reasoning set forth in *Elrod, supra,* and *Branti, supra.* In doing so, however, he recognized that the doctrine of *stare decis* commands the inferior courts to follow the decisions of the United States Supreme Court. Thus, despite his criticisms, the appellate court and the district court are bound to follow the law as set forth in *Branti* and *Elrod* to evaluate the constitutionality of patronage appointments.

**27.** In *Branti, supra,* 445 U.S. at 517, 100 S.Ct. at 1294, the court stated that in proving the third element the plaintiff must show that the government employer's personnel decision was made solely for the reasons that the employee was not affiliated with the party in power. As stated in *Elrod,* in order for the retention of public employment, conditioned upon:

> ... the employee's support of the in-party ... to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

*Elrod, supra,* 427 U.S. at 363, 96 S.Ct. at 2684 (footnote omitted). In *Elrod* and *Branti,* the court stated that patronage dismissals for those in policymaking positions survives the above balancing test, and hence are constitutionally proper since the use of patronage assures the political loyalty of those who are responsible for implementing the policies of the new administration, which were "presumably sanctioned by the electorate." *Elrod, supra* at 367, 96 S.Ct. at 2686. To determine

260, 265 (3d Cir.), *cert. denied,* 469 U.S. 886, 105 S.Ct. 260, 83 L.Ed.2d 196 (1984). Implicit in proving that his affiliation was a motivating factor in the personnel decision is proof that the state actors knew of the employee's political persuasion. *Id.* at 265.

 Once the employee has shown that his constitutionally protected conduct played a substantial role in the employer's personnel decisions, the burden shifts to the employer who may dispel the inference of unconstitutional conduct by showing "by a preponderance of the evidence that it would have reached the same decision as to the [employee's status] even in the absence of protected conduct." *Mt. Healthy, supra,* 429 U.S. at 287, 97 S.Ct. at 576.

 Applying these principles to the case at bar, there is no doubt that plaintiff, a city police officer and hence a public employee, exercised his right to maintain a political affiliation with the supporters of former Mayor Gerald McCann. As stated previously, the Cucci camp was well aware of both plaintiff's decision to do so and the actions he took to advance the McCann campaign effort. Moreover, the direct and circumstantial evidence indicates that his

affiliation with the ultimately losing candidate was a motivating factor in his subsequent demotion. Not only was his demotion in accordance with the standard operating procedures that historically characterized post-election personnel changes in the JCPD, but the evidence demonstrates that these defendants planned such personnel actions even prior to their successful election and/or appointment to office. As stated previously, the Cucci camp knew its political allies and enemies and on more than one occasion discussed, albeit informally, the reprisals that they would specifically take against members of the opposition employed by the police department. Immediately upon assuming office, the defendants carried out these plans and effective July 1, 1985, the date Cucci took the oath of office and swore in his administration, plaintiff was demoted. Once again the sequence of events, and evidence regarding both plaintiff's public support of McCann and defendants knowledge of same, and plans to punish such conduct along with the historical use of patronage in appointments in the JCPD [28], all support

... whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.
*Elrod* at 368, 96 S.Ct. at 2687. *See also Brown v. Trench,* 787 F.2d 167, 168–70 (3d Cir.1986) stating that in evaluating whether a public employee holds a policymaking position the court should consider the function of the public office in question, whether the job involves policymaking or constitutes a confidential position, and whether the "employee has meaningful input into decisionmaking concerning the nature and scope of a major township program," irrespective of the amount of supervisory authority the employee possesses. In this regard, consideration must also be given to whether or not the position could be effectively performed only by someone who shares particular political beliefs. Put differently, if the principle duty of an individual who holds the position at issue is to promote the policies of the administration, then the holder of that position could be dismissed based solely upon his political affiliation, without violating the first amendment.
In the case at bar, no issue was raised as to whether plaintiff occupied a policymaking position, in which case his party affiliation could have been considered "an appropriate requirement for the effective performance of the public

office involved." *Branti, supra,* 445 U.S. at 518, 100 S.Ct. at 1294. Defendant bears the burden of proof on this issue. *Laskaris, supra* at 264 n. 4. As defendants have neither raised nor adduced evidence on this point, it shall be deemed waived as a justification for its personnel decision.
Thus, it appears defendants concede, and the cases hold, that plaintiff does not hold a position in which his party affiliation is an appropriate requirement for the effective performance of the public office involved. *See Branti, supra,* 445 U.S. at 517–18, 100 S.Ct. at 1294–95.
Thus, in the absence of an overriding interest, such as preserving political loyalty of those in policymaking positions, so that their views conform with those of hiring authority, plaintiff's political beliefs cannot be used as the sole basis for depriving him continued public employment, *Id.* at 515–16, 100 S.Ct. at 1293–94, and a patronage based dismissal of an individual holding such a nonpolicymaking public position cannot be justified. *See Elrod, supra,* 427 U.S. at 367–68, 371 n. 27, 96 S.Ct. at 2686–87, 2689 n. 27.

**28.** Despite defendants' claims that they have tried to eliminate the effect of political partisanship within the JCPD, it is not clear that the laudable recommendations of the DePascale Report or the other proposed regulations on per-

the conclusion that plaintiff's political affiliation was a motivating factor in his demotion.

As there is no dispute that plaintiff did not hold a policymaking position within the city administration which he could have lost based solely on his political affiliation. *See* note 27, *supra,* I now determine whether defendants have proven by a preponderance of the evidence that plaintiff would have been demoted even in the absence of protected conduct.

As stated previously, I find that defendants contention that plaintiff was demoted based solely on the four-year criterion is without support. The inconsistent manner in which defendants applied the criterion, the fact it was applied to plaintiff on the first day of the new administration, without prior review of his file, and defendants' failure to offer plaintiff reassignment without increased salary, as it had done for others, all reflect that while the four-year criterion may have had some rational basis (i.e. requiring a certain amount of years of experience to justify certain pay levels), defendants have failed to convince me by a preponderance of the evidence that this was the true basis for plaintiff's demotion. Rather, plaintiff, a public employee, who engaged in the protected first amendment activity of free association, was demoted because of his political affiliation, and hence was penalized for exercising his constitutional right to free association. As the defendants have failed to prove any other basis for their conduct, their demotion of plaintiff violated 42 U.S.C. § 1983.

### d. *Summary.*

The above demonstrates that plaintiff was a victim of a destructive practice, which is a wayword use of the spoils system. While the opinion is limited in terms of the deprivations that plaintiff has suffered, in fairness it must be noted that the evidence presented in this case supports a

conclusion that Cucci's predecessor, Gerald McCann, and in all probability, other previous city administrations have engaged in similar unconstitutional activity. A multitude of wrongs however, do not make a right or permit this court to find palatable defendants' unconstitutional conduct.

For all of the above reasons, I find that plaintiff has proven that defendants have violated his first amendment rights to free speech and free association, and as state actors, are liable under 42 U.S.C. § 1983.

### 2. Due Process Claim.

The fourteenth amendment provides that "[n]o State shall ... deprive any person of ... property, without due process of law." As the Court of Appeals for the Third Circuit stated in *Stana v. School Dist. of City of Pittsburgh,* 775 F.2d 122, 125–26 (3d Cir.1985):

> [T]he 'property' that is safeguarded by the due process clause of the Fourteenth Amendment may be 'created ... by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' *Id.* '[T]he types of interests protected as "property" are varied and, as often as not, intangible, relating "to the whole domain of social and economic fact." ' *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430 [102 S.Ct. 1148, 1155, 71 L.Ed.2d 265] ... (1982) (quoting *National Mutual Insurance Co. v. Tidewater Transfer Co.,* 337 U.S. 582, 646 [69 S.Ct. 1173, 1209, 93 L.Ed. 1556] ... (1949) (Frankfurter, J., dissenting)); *cf. Perri v. Aytch,* 724 F.2d 362, 364 (3d Cir.1983). Property interests are often expressly created by state statutes or regulations, *but they can also arise from written or unwritten state or local government policies or from 'mutually explicit*

---

missible political activity in the department have been implemented. *See* note 5, *supra.* The record reflects, for instance, that in 1988 Mayor Cucci rescinded an attempt to eliminate any pay differential between patrolmen and detectives. While his motives may have been innocent, this decision not only reflects his incli-

nation to maintain the old order but also confirms the cachet that police officers perceive in the receipt of a plainclothes assignment. Put succinctly, Cucci's decision to rescind the abolishment of the pay differential preserved the dichotomy between the ranks of patrolmen and detectives.

*understandings' between a government employer and employee. See Perry v. Sindermann,* 408 U.S. 593, 601–02 [92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570] ... (1972). In all cases, the relevant inquiry is whether the claimant has a 'legitimate claim of entitlement.' *[Board of Regents v. Roth,* 408 U.S. 564, 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548] (1972) ].

(emphasis added). *See also Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (stating that "a property interest in employment can ... be created by an ordinance, or by an implied contract").

To succeed on a claim that the removal from a position of public employment violates due process, the public employee must prove:

.... (1) that the dismissal deprived him of a property or liberty interest, and (2) that the employer did not afford him adequate procedural protections in connection with the action. *Federal Deposit Ins. Corp. v. Mallen,* [486 U.S. 230] 108 S.Ct. 1780, 1787 [100 L.Ed.2d 265] (1988); *Cleveland Bd. of Education v. Louder-*

*mill,* 470 U.S. 532, 538–41 [105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494] (1985). In the absence of circumstances requiring his prompt removal, an employee with a protected interest in his employment may be terminated only after receiving notice of the charges against him and an opportunity for hearing sufficient to respond to those charges. *Id.* [470 U.S.] at 542–48 [105 S.Ct. at 1493–97].

*Richardson v. Felix,* 856 F.2d 505, 507 (3d Cir.1988). As in *Richardson,* the issue before me is narrow. There is no dispute that plaintiff received no notice of his demotion nor an opportunity for a hearing before the personnel decision had become *"a fait accompli." Id.* Moreover, the defendants have not asserted that such pre-demotion notice or hearing would have been impracticable. Thus, plaintiff can prevail on his due process claim "if he can establish that his dismissal deprived him of a protected interest." *Id.* If plaintiff demonstrates that he has a protected property interest in his continued retention of his position as a detective, then he is entitled to due process, the absence of which violates the constitution.[29] *See Brown, supra,* at 170.

**29.** While the state "may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Loudermill, supra* 470 U.S. at 541, 105 S.Ct. at 1493, *quoting Arnett v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 1650, 40 L.Ed.2d 15 (1974) (Powell, J. concurring). The Supreme Court and the Court of Appeals for the Third Circuit have discussed the amount of process due public employees. As the appellate court observed in *Morton v. Beyer,* 822 F.2d 364, 367–68 (3d Cir.1987):

In *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532 [105 S.Ct. 1487, 84 L.Ed.2d 494] ... (1985), the Supreme Court held that, prior to termination, a public employee with a property interest in continued employment must be afforded 'a pretermination opportunity to respond, coupled with post-termination administrative [or judicial] procedures.' *Id.* at 547–48 [105 S.Ct. at 1496–97] ... '[T]he pretermination "hearing", though necessary, need not be elaborate.' *Id.* at 545 [105 S.Ct. at 1495] .... Nor must it 'definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the

proposed action.' *Id.* at 545–46 [105 S.Ct. at 1495–96] ... To ensure that the pretermination hearing is a meaningful one, the employee 'is entitled to oral or written notice of the charges against him [or her,] an explanation of the employer's evidence, and an opportunity to present his [or her] side of the story.' *Id.* at 546 [105 S.Ct. at 1495].... Finally, the availability of extensive post-termination procedures does not eliminate the essential requirement of due process that a hearing be provided before discharge. *Id.* at 545; *see also Gniotek v. City of Philadelphia,* 808 F.2d 241, 243 (3d Cir.1986) ("The predeprivation hearing ... is necessary, even if extensive post-deprivation remedies are afforded."); *cf. Loudermill,* 470 U.S. [532] at 547 n. 12 [105 S.Ct. 1487, 1496 n. 12, 84 L.Ed.2d 494 (1985) ] ... ("[T]he existence of post-termination procedures is relevant to the necessary scope of pretermination procedurse.").

*See also Fraternal Order of Police Lodge No. 5 v. Tucker,* 868 F.2d 74, 79 (3d Cir.1989) (discussing the recognition in *Loudermill, supra,* 470 U.S. at 544, 105 S.Ct. at 1494, that 'the pretermination hearing may be informal so long as it affords the employee an opportunity to make any plausible arguments that might ... prevent [the] discharge.').

As stated previously, state law determines whether such a property right exists. *Id.* at 170, *citing Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). As the Supreme Court stated in *Bishop, supra,* 426 U.S. at 344, 96 S.Ct. at 2077, *Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709, and *Perry, supra,* 408 U.S. at 601, 92 S.Ct. at 2699, and as the appellate court observed in *Stana, supra,* at 125–26, plaintiff may have a property interest protected by the due process clause of the fourteenth amendment pursuant to state statute, regulation, local governmental policy, or an agreement between the employee and the governmental employer. For example, "[t]he hallmark of a constitutionally protected property interest [in public employment] is an individual entitlement [that he] 'cannot be removed except' for cause.' " *Richardson, supra,* at 509 (quoting *Logan v. Zimmerman Brush,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982). Thus, to determine whether plaintiff has a protectible property interest in continued employment as a detective, I shall examine the pertinent state statutory provision [30] and governmental policies to see if they guarantee continued employment "except for cause."

According to N.J.Stat.Ann. 40A:14–118:

... the governing body of any municipality, by ordinance, may create and establish ... a police force ... and provide for the maintenance, regulation, and control thereof.... any such ordinance shall ... provide ... for the adoption and promulgation by the appropriate authority of rules and regulations for the government of the force and for the discipline of its members. The ordinance may provide for the appointment of a chief of police and such members, officers and personnel as shall be deemed necessary, the determination of their terms of office,

In *Gniotek v. City of Philadelphia,* 808 F.2d 241, 244–46 (3d Cir.1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987) and *Copeland v. Philadelphia Police Department,* 840 F.2d 1139, 1145 (3d Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1636, 104 L.Ed.2d 153 (1989), the Court of Appeals recognized that city police officers have a cognizable property interest in their jobs that is sufficient to trigger the procedural due process protections of the fourteenth amendment. As such, an officer is entitled to notice of the charges against him and an opportunity to be heard, or provide some response to the charges, prior to the termination of his employment. In *Loudermill,* the Supreme Court clarified that the notice must provide a sufficient explanation of the employer's evidence so that the officer could formulate a meaningful response.

30. As civil servants employed by the City of Jersey City, certain provisions of the state statutes govern certain conditions of the employment of Jersey City police officers. For instance, N.J.Stat.Ann. 40A:14–147 states that:

Except as otherwise provided by law, no permanent member or officer of the police department or force shall be removed from his office, employment or position for political reasons or for any cause other than incapacity, misconduct, or disobedience of rules and regulations established for the government of the police department and force, nor shall such member or officer be suspended, removed, fined or reduced in rank from or in office, employment, or position therein, except for just cause as hereinbefore provided and then only upon a written complaint set-

ting forth the charge or charges against such member or officer. Said complaint shall be filed in the office of the body, officer or officers having charge of the department or force wherein the complaint is made and a copy shall be served upon the member, or officer so charged, with notice of a designated hearing thereon by the proper authorities, which shall be not less than 10 nor more than 30 days from date of service of the complaint. A failure to comply with said provisions as to the service of the complaint shall require a dismissal of the complaint.

*See also* N.J.Stat.Ann. 40A:14–128 which states that:

Except as otherwise provided by law, in any municipality having permanent members and officers of a police department and force, the employment of said members and officers shall be indeterminate and continuous during good behavior and efficiency.

These state statutory provisions reveal that permanent members of a municipal police department may not be removed from their position for political reasons or for any reason except those set forth above or upon a showing of "just cause." Given the existence of the "just cause" standard for discharge, the state statutory scheme bestows a property interest on permanent members of the force which cannot be abrogated by their government employer without due process. *See Loudermill, supra; Richardson, supra* at 509, *Abraham v. Pekarski,* 728 F.2d 167, 170–71 (3d Cir.1984) *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); *Capua v. City of Plainfield,* 643 F.Supp. 1507, 1520 (D.N.J.1986).

the fixing of their compensation and the prescription of their powers, functions and duties all as the governing body shall deem necessary for the effective government of the force.

Presumably, pursuant to this statutory authority, in 1961 the JCPD promulgated the "Rules and Procedures of the Jersey City Police Department," apparently under the auspices of the Director of Police and Mayor. *See* Plaintiff's Ex. 42. These rules provide that:

Any permanently employed officer or employee who receives a fixed annual salary from the municipality shall not be suspended, removed, fined or reduced from office or employment therein except for just cause and then only after written charges and complaint shall have been preferred.

*See id.* at Rule 723. Hence, this departmental regulation permits removal or reduction from office only in the presence of "just cause," and therefore creates a protectible property interest in employment as a Jersey City police officer, for those employees who are "permanent" or "receive a fixed annual salary from the municipality."

■■■ Even assuming that the term permanent as used in the context of this rule refers to "tenured," *see* N.J.Stat.Ann. 40:174–48 and assuming that plaintiff does not have "permanent" status, the record reveals that he was indeed an employee who "receive[d] a fixed annual salary from the municipality." As such plaintiff was within the ambit of Rule 723 and therefore could not be removed or reduced from office or employment absent "just cause." As the existence of just-cause requirement grants plaintiff a protected property interest in his position, *see Logan, supra,* 455 U.S. at 430, 102 S.Ct. at 1154; *Richardson, supra,* at 509, plaintiff could be deprived of the continued retention of his position only in accordance with due process. Since plaintiff has demonstrated that the demotion, deprived him of a property interest, and since there is no dispute that defendants did not afford him any procedural protections, plaintiff has demonstrated that his demotion, absent notice and hearing,

violated due process. As these state actors failed to provide him with his constitutional procedural entitlement in contravention of the fourteenth amendment of the constitution, they have violated 42 U.S.C. § 1983.

■■■ For the purposes of assigning § 1983 liability for violation of its right to due process, I find that since it was the responsibility of the Director of Public Safety to hold trials, review, and receive complaints, *see* Rules 721, 724–25, only the director or his agent, such as the Chief of Police, or other superior officer can be held liable for the deprivation. *Id.* at Rules 731–33, 736–37. For these reasons, defendant Adams is solely liable for this violation of § 1983.

3. Equal Protection Claim.

■■■ The equal protection clause of the fourteenth amendment provides that "[n]o state shall ... deny any person within its jurisdiction the equal protection of the laws." This provision "directs that 'all persons similarly circumstanced shall be treated alike.'" *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982) (quoting *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)). As the appellate court recognized in *Price v. Cohen,* 715 F.2d 87, 91 (3d Cir.1983), *cert. denied,* 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 700 (1984), however,

[d]espite the apparent sweep of its language, the equal protection clause does not require the state to treat all persons alike. *Tigner v. Texas,* 310 U.S. 141, 147 [60 S.Ct. 879, 882, 84 L.Ed. 1124] ... (1940). In fact, the Supreme Court has recognized that a legislature "must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Plyler v. Doe,* 457 U.S. 202, 216 [102 S.Ct. 2382, 2394, 72 L.Ed.2d 786] ... (1982).

To establish a violation of the equal protection clause, a plaintiff must show

that the allegedly offensive categorization invidiously discriminates against the disfavored group. The level of deference shown to the state-created categories varies according to the group discriminated against and the right or interest infringed. Certain groupings, such as those based on race, are regarded as suspect. As a result, the state may employ racial classifications only if it has a compelling reason to do so. At the other end of the spectrum of judicial scrutiny, regulations that have differing impacts on various types of commercial entities, for example, a city ordinance controlling advertising on delivery vehicles, violate the equal protection clause only if they are not rationally related to a legitimate state interest. *Railway Express Agency v. New York*, 336 U.S. 106 [69 S.Ct. 463, 93 L.Ed. 533] ... (1949). [*See also Cleburne v. Cleburne Living Center Inc.*, 473 U.S. 432, 440[, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313] (1985) in which the court acknowledge that such at test applies to examining the validity of "state legislation or other official action that is challenged as denying equal protection."] The Supreme Court has also applied a middle-tier level of scrutiny to certain classifications which 'give rise to recurring constitutional difficulties,' such as those based on alienage, gender, or illegitimacy. *Plyler v. Doe*, 457 U.S. at 217 [102 S.Ct. at 2395] ... These sensitive categories must be substantially related to the achievement of important governmental objectives. *Lalli v. Lalli*, 439 U.S. 259[, 99 S.Ct. 518, 58 L.Ed.2d 503] ... (1978); *Craig v. Boren*, 429 U.S. 190 [97 S.Ct. 451, 50 L.Ed.2d 397] ... (1976). Regardless of the group discriminated against, the courts will strictly scrutinize governmental actions which seriously burden fundamental rights. The state may, for example, restrict voting, access to the judicial process, and interstate travel only if the limiting classification has been precisely tailored to serve a compelling governmental interest.

Thus, the existence of governmental action, such as the implementation of an executive policy that creates classifications of people,

is subject to various levels of scrutiny under the equal protection clause. Here, plaintiff does not contend that defendants have imposed a policy that is based upon the existence of a suspect class. *See Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312–14, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976) (setting forth the characteristics of a suspect class); *Cleburne, supra*, 473 U.S. at 440–447, 105 S.Ct. at 3254–58, *Plyler, supra*, 457 U.S. at 216, 218 & n. 14, 102 S.Ct. at 2394, 2395 & n. 14. Therefore, the classification at issue is subject only to rational relation review. *See Price, supra*, at 92, 94; *see also In re Asbestos Litigation*, 829 F.2d 1233, 1238 (3d Cir.1987), *cert. denied*, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988) (reiterating the general rule that "classifications that neither regulate suspect classes nor burden fundamental rights must be sustained if they are rationally related to a legitimate governmental interest") *Accord Mathews v. Lucas*, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976); *Empire Kosher Poultry Inc. v. Hallowell*, 816 F.2d 907, 913 (3d Cir.1987). This deferential standard of review is premised on the fact that state actors, such as legislatures and executive agencies,

must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill, ... [The court] ... seeks only the assurance that the classification at issue bears some fair relationship to legitimate public purpose.

*Plyler, supra*, 457 U.S. at 216, 102 S.Ct. at 2394. *See also Bowen v. American Hospital Ass'n*, 476 U.S. 610, 627, 106 S.Ct. 2101, 2112, 90 L.Ed.2d 584 (1986) (relying on equal protection cases, the Court examined the decision of an executive agency under a rational relationship analysis.). Thus, under this standard, a court:

will not overturn [a statute that does not burden a suspect class or a fundamental interest] unless the varying treatment of

different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

*Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979). Since such governmental decisions will be upheld if they are rationally related to a legitimate government purpose, plaintiff bears "the 'heavy burden' of overcoming a presumption of rationality 'by a clear showing of arbitrariness and irrationality.'" *Hahn v. United States,* 757 F.2d 581, 594 (3d Cir. 1985) (quoting *Hodel v. Indiana,* 452 U.S. 314, 332–33, 101 S.Ct. 2376, 2387–88, 69 L.Ed.2d 40 (1981)).

 In short, when presented with a challenge to a nonsuspect government classification, the court "must determine if the [policy] rationally furthers any legitimate state objective." *Malmed v. Thornburgh,* 621 F.2d 565, 569 (3d Cir.), *cert. denied,* 449 U.S. 955, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980), *quoted in Hancock Indus. v. Schaeffer,* 811 F.2d 225, 237 (3d Cir.1987). A classification challenged under the rational basis test survives scrutiny if (1) "at least one of the purposes of the classification involves a legitimate public interest" and (2) "the classification is rationally related to achievement of that purpose." *Hancock, supra,* at 237. In general, neither of these factors requires the court "to inquire into the subjective motives of the decision makers" since it is constitutionally irrelevant whether the reasons for the state action "in fact underlay the [governmental policy or rule or decision]." *Id.* at 237–38 (quoting *U.S. Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980) (quotation marks omitted)). In the absence of contemporaneous declarations regarding the purpose of the challenged state action, however, the court must accept "rationales construed after the fact, 'unless an examination of the circumstances forces [the court] to conclude that they "could not have been the goal of the [governmental action]."'" *Id.* at 237 (*quoting Minnesota v. Clover Leaf Cramery Co.,* 449 U.S. 456, 463 n. 7, 101

S.Ct. 715, 723 n. 7, 66 L.Ed.2d 659 (1981) (*in turn quoting Weinberger v. Wiesenfeld,* 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975)).

 In this case, plaintiff asserts that defendants violated the equal protection clause of the fourteenth amendment "by summarily demoting him from Detective to Patroman and cutting his salary on the bases of a classification that does not meet the minimum standards of 'rational basis.'" Plaintiff's Proposed Conclusion of Law No. 5. He apparently argues that the so-called "four-year criterion" creates a classification that is not rationally related to a legitimate government purpose. According to the classification, only those members of the force with at least four years experience as patrolmen are entitled to hold the position of paid detective; those with less than four years experience as patrolmen could hold only the position of uniformed officer or unpaid detective.

Prior to implementing the criterion, Director Adams discussed it with various officers in the department. At no time did he discuss it with the Union or memorialize it or its purposes in writing. Thus, there is no recorded contemporaneous declarations of its purpose.

During the course of trial, however, Director Adams offered the following explanation for the policy: by requiring an officer to accumulate four years of service before becoming eligible for a promotion with a commensurate pay increase, Adams hoped to eliminate a situation in which less experienced officers received greater pay than those with more years of service. He admitted that "experience is not the criteria for the reassignment. The criteria for the pay is the four years." Record at 849 (Adams). This rationale differs, however, from that set forth in defendants response to plaintiff's interrogatories. In their answer, defendants stated that the purpose of the four-year criteria was to ensure that officers in positions of supervisory authority had sufficient experience. Defendants' Response to Plaintiff's Interrogatory No. 10. Clearly, this rationale is at odds with that articulated by the individual who

claims to have devised and implemented the policy and further reflects that his post-hoc explanations for the policy do not embody its true goal.

Moreover, the circumstances under which the rule was implemented undermine the veracity of these "after the fact" rationales. For instance, the rule was adopted without discussion with the union or even notice to the members prior to its application. In addition, the rule was applied to individual officers without prior review of their files. Adams determined which officers were within and outside the scope of the policy based upon his personal knowledge of the effected officer's years of service on the force. Had the force been the size of that of "Mayberry," it is arguable that such decisions could have been made without consultation with the members' personnel files. The JCPD, however, has more than 100 officers, and I find it difficult to believe that the Director would have the specific knowledge regarding each officers' service record, particularly in light of the numbers on the force and the other responsibilities he carried as Director.

Additionally, the fact he implemented the criterion on his first day in office is at least curious. Indeed, while his purported justification for the criterion was ostensibly to improve morale, there is no indication that the department's morale problem required such emergent attention. An examination of all of these circumstances leads me to conclude that the post hoc rationales offered do not reflect the goals of the policy.

While the court will not strike down a regulation, law, or governmental policy "because [it] may be unwise, improvident, or out of harmony with a particular school of thought," *Williamson v. Lee Optical Co.*, 348 U.S. 483, 488, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955), the court need not sustain conduct based upon a rule when its pur-

ported basis is untrue. *See Bowen, supra,* 476 U.S. at 627, 106 S.Ct. at 2112 (Justice Stevens, speaking for the plurality in the context of review of the existence of a rational connection between the facts and an agency's decision, stated that

the mere fact that there is some rational basis within the knowledge and experience of the [regulators], ... under which they might have concluded that the regulation was necessary to discharge their statutorily authorized mission ... will not suffice to validate the agency decision making.

(footnotes, quotation marks, and citations omitted)).

While in this instance I cannot say the interests in improving morale and attempting to balance the salaries officers earn based on years of service are not legitimate, I find that defendants' articulation of these interests to justify the four-year criterion was pretextual.[31] Thus, I find that defendant has failed to demonstrate that the purpose of the classification involved a legitimate public interest. Rather, the circumstances demonstrate that the purpose of the rule was to treat a class of public employees differently because of their political affiliations. The implementation of the criterion on the day Cucci assumed his position as Mayor, the inconsistent manner with which the criterion was applied, and its application to the effected officer without consultation with their personnel file, all demonstrate that the implementation was politically motivated. Finally, and most importantly, I believe the selection of a four-year time period was merely coincidentally related to the salary schedule set forth in the collective bargaining agreement. Use of the four-year time span allowed the Cucci administration to demote those officers who were promoted

---

**31.** I note, however, that

legislative classifications will be upheld under rational relationship scrutiny "if any state of facts reasonably can be conceived that will sustain" them. *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. [61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)].. "Where ... there are plausible reasons for [the legislature's] action, our inquiry is at an end. It is, of course,

'constitutionally irrelevant whether this reasoning in fact underly the legislation,' because this Court has never insisted that a legislative body articulate its reasons for enacting a statute." *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179 [101 S.Ct. 453, 461, 66 L.Ed.2d 368] ... (1980) (citations omitted).

*Price, supra* at 94 (footnote omitted).

four years earlier under the McCann regime, and thereby prevent these individuals from obtaining the security of tenure. Thus, for all of these reasons I find that the challenged classification is not rationally related to the government interests articulated as the rationales offered were pretextual, and hence, the application of the policy in the case at bar violated the equal protection clause of the fourteenth amendment. As the defendants have adopted a classification that deprives plaintiff of this constitutional protection, they have violated [32] 42 U.S.C. § 1983.

For the purposes of imposing liability for this violation of the equal protection clause, I find that as defendant Adams admittedly created and implemented this policy, he is liable. While there is evidence that Adams discussed the policy with Mayor Cucci, the testimony is insufficient to find him liable for the equal protection problems that the policy imposed. Moreover, the record fails to reveal that defendant Vazquez contributed in any way to the implementation of the policy. Defendant Lopez, however, approved of the personnel decisions taken pursuant to the four-year criterion, he is liable for its consequences. While all four defendants are liable under § 1983 for penalizing plaintiff for the exercise of his first amendment rights, only defendants Adams and Lopez are liable for the consequential equal protection problems created by the modality through which the penalty was imposed.

*B. Section 1985(3)*

Section 1985(3) of Title 42 provides, in pertinent part, that:

> ... if two or more persons in any State ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... [and] ... if one or more persons engaged

[in the conspiracy] do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having an exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

A claim under this statutory provision invokes a different analysis than a claim under § 1983, and therefore must be treated separately. *See Rode, supra,* at 1206. Plaintiff must prove a variety of elements. *Griffin v. Breckenridge,* 403 U.S. 88, 103–04, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971); *Bethel v. Jendoco Constr. Corp.,* 570 F.2d 1168, 1172–73 (3d Cir.1978). First, plaintiff must show that he is a member of a class protected under § 1985(3).

Second, plaintiff must prove the existence of a conspiracy. In doing so, plaintiff must show that two or more persons reached an understanding or agreement, either expressed or implied, to commit acts to violate plaintiff's civil rights. *See Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir.1988); *DeBotton v. Marple Twpshp,* 689 F.Supp. 477, 482 (E.D.Pa.1988); *Hunt v. Weatherbee,* 626 F.Supp. 1097, 1107 (D.Mass.1986); *Martin v. Delaware Law School of Widener University,* 625 F.Supp. 1288 (D.Del.1985); *Juan v. Rafferty,* 577 F.Supp. 774 (D.NJ.1984); *Smith v. Butler,* 507 F.Supp. 952, 953–54 (E.D.Pa.1981); *Santiago v. City of Philadelphia,* 435 F.Supp. 136, 155–56 (E.D.Pa.1977). While plaintiff must prove the existence of at least a tacit agreement to commit the unlawful acts, a conspiracy may be proven regardless of whether each conspirator knew of the details of the conspiracy or the part to be performed by the other co-conspirators. *See Picking v. Pennsylvania R. Co.,* 5 F.R.D. 76, 79 (M.D.Pa.1946).

---

**32.** I so concluded despite the fact the classification does not impinge upon a fundamental constitutional right. *See Kranson v. Valley Crest Nursing Home,* 755 F.2d 46, 52 (3d Cir.1985) and cases cited therein. Apparently, a governmental regulation may be challenged if it involves the classification of persons or if the classification impinges upon a fundamental constitutional right. Proof of either of these circumstances may state a claim under the equal protection clause.

Third, plaintiff must show that the purpose of the conspiracy was to deprive him of equal protection of the laws. *See Brawer v. Horowitz,* 535 F.2d 830, 837 (3d Cir. 1976). Plaintiff need not show defendants acted willfully. *Griffin, supra,* 403 U.S. at 102 n. 10, 91 S.Ct. at 1798 n. 10. Rather "the motivation aspect of § 1985(3) focuses not on scienter in relation to deprivation of rights, but an invidiously [class based] discriminatory animus." *Id.; see Burt v. Ferrese,* 871 F.2d 14, 18 (3d Cir.1989); *Pratt v. Thornburgh,* 807 F.2d 355, 357 (3d Cir.1986), *cert. denied,* 484 U.S. 839, 108 S.Ct. 125, 98 L.Ed.2d 83 (1987); *Rogin v. Bensalem Twpshp.,* 616 F.2d 680, 696 (3d Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). Discriminatory purpose is not presumed, intentional discrimination must be clearly shown. *DeBotton, supra,* at 482.

Fourth, plaintiff must demonstrate that the conspirators committed an act in furtherance of conspiracy. In this regard, plaintiff must adduce proof that "there is some degree of relationship between the act done and object of the conspiracy." *Novotny v. Great Am. Federal Savings & Loan Ass'n,* 584 F.2d 1235, 1246 n. 46 (3d Cir.1978); *rev'd on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

Finally, plaintiff must show that he was injured in his person or property, or that he has been deprived of having or exercising any right of citizenship.

As stated previously, in examining plaintiff's claim under § 1985(3), I must first determine whether or not this provision reaches nonracial, politically motivated conspiracies. *See Novotny, supra,* at 1240. In *United Bhd. of Carpenters et al. v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1982), the Supreme Court examined the legislative history of § 1985(3), and observed with respect to the aim of the statute that:

> ... Although we have examined with some care the legislative history that has been marshaled in support of the position that Congress meant to forbid wholly nonracial, but politically motivated conspiracies, we find difficult the question whether § 1985(3) provided a remedy for every concerted effort by one political group to nullify the influence of or do other injury to a competing group by use of otherwise unlawful means. To accede to that view would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume. If respondents' submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings.

*Id.* at 836, 103 S.Ct. at 3360. This conclusion, however, was reached with the following caveat:

> ... We realize that there is some legislative history to support the view that § 1985(3) has a broader reach. Senator Edmunds' statement on the floor of the Senate is the clearest expression of this view. He said that if a conspiracy were formed against a man 'because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter, ... then this section could reach it.' Cong.Globe, 42 Cong., 1st Sess., 567 (1871). The provision that is now § 1985(3), however, originated in the House. The narrowing amendment, which changed § 1985(3) to its present form, was proposed, debated, and adopted there, and the Senate made only technical changes to the bill. Senator Edmunds' views since he managed the bill on the floor of the Senate, are not without weight. But we were aware of his views in *Griffin,* 403 U.S. at 102, n. 9 [91 S.Ct. at 1798 n. 9], and still withheld judgment on the question whether § 1985(3), as enacted, went any farther than its central concern—combating the violent and other efforts of the Klan and its allies to resist and to frustrate the intended effects of the Thirteenth, Fourteenth, and Fifteenth Amendments.

Lacking other evidence of congressional intention, we follow the same course here ... [and hold only that § 1985(3) does not] reach conspiracies motivated by economic or commercial animus.

*Id.* 463 U.S. at 836–38, 103 S.Ct. at 3360–61.

Cases decided both before and after *Scott* have examined whether the politically based classes are protected under § 1985(3). A majority of these cases had that § 1985(3) covers politically motivated conspiracies. *Compare Volk v. Coler,* 845 F.2d 1422, 1434 (7th Cir.1988) (§ 1985(3) "extends beyond conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty"); *Galloway v. Louisiana,* 817 F.2d 1154, 1159 (5th Cir. 1987) (to succeed on a § 1985(3) claim, plaintiff must show, *inter alia,* "membership in some group with inherited or immutable characteristics (e.g., race, gender, religion, or national origin), or that the discrimination resulted from the plaintiff's political beliefs or associations"); *Conklin v. Lovely,* 834 F.2d 543, 548–49 (6th Cir. 1987) (section 1985(3) reaches conspiracies to deprive civil rights based upon political views); *Hobson v. Wilson,* 737 F.2d 1, 21 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985) (noting that while the Supreme Court was troubled by whether political classes are covered under § 1985(3), political affiliation with racial overtones is within the ambit of statutory protection); *Keating v. Carey,* 706 F.2d 377, 386–88 (2d Cir.1983) (holding that § 1985(3) is aimed at prohibiting political discrimination); *Kimble v. D.J. McDuffy Inc.,* 648 F.2d 340, 347 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981) (a finding that class based on political beliefs or associations is the kind of class that the framers of the Ku Klux Klan Act intended to protect); *Browder v. Tipton,* 630 F.2d 1149, 1152 (6th Cir.1980) (actions against another based on political animus violates the statute); *Hampton v. Hanrahan,* 600 F.2d 600, 623 n. 22 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (recognizing that "[d]iscrimination on the basis of political beliefs or affiliations has been found to

be actionable under section 1985(3)," and on this basis held that the Black Panthers were entitled to § 1985(3) protection); *Means v. Wilson,* 522 F.2d 833, 839–40 (8th Cir.1975), *cert. denied,* 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (political opponents are a protected class) (*cited with approval in Life Ins. Co. of North American v. Reichardt,* 591 F.2d 499, 505 (9th Cir.1979)) (regarding the broad construction of classes that § 1985(3) protects); *Glasson v. City of Louisville,* 518 F.2d 899 (6th Cir.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975) (opponents of a political figure are protected); *Cameron v. Brock,* 473 F.2d 608 (6th Cir.1973) (supporters of a political candidate are protected); *Craig v. Celeste,* 646 F.Supp. 47, 50–51 (S.D.Ohio 1986) (Republicans are protected under § 1985(3)); and *Stevens v. Rifken,* 608 F.Supp. 710, 722–23 (N.D.Cal. 1985) (holding that a dissident political group organized to effect and/or prevent political and social change is entitled to § 1985(3) protection since enactment of the statute "was motivated in large part as a desire to inhibit one political group from attempting to violate the civil rights of another politcal group") *with Grimes v. Smith,* 776 F.2d 1359 (7th Cir.1985) (§ 1985 does not reach nonracial political conspiracies); *Harrison v. KVAT Food Management Inc.,* 766 F.2d 155, 156–63 (4th Cir. 1985) (rejecting the conclusion in *Keating* that Republicans are a protected class under the statute on the ground that *Keating* was decided prior to *Scott* and hence its viability is in doubt); *Schultz v. Sundberg,* 759 F.2d 714, 718 (9th Cir.1985) (coalition of legislators who sought to block governor's appointments not a class about which "there has been a governmental determination that its members require and warrant special federal" protection and hence cannot assert a claim under § 1985(3)); *Gendalia v. Gioffre,* 606 F.Supp. 363, 367–68 (S.D.N.Y.1985) (members of the democratic party are not subject to the sort of invidious discrimination that § 1985(3) attempts to eliminate); *Sellers v. Local 1598,* 600 F.Supp. 1205, 1212 (E.D.Pa.1984), *aff'd mem.,* 810 F.2d 1164 (3d Cir.1986) and cases cited therein (stating that § 1985(3)

was not meant to regulate combat between political parties, rather claims that political affiliation influence the retention of public employment may be brought pursuant to § 1983 or the substantive due process clause of the fourteenth amendment); *Hauptmann v. Wilentz*, 570 F.Supp. 351, 386 n. 37 (D.N.J.1983), *aff'd mem*, 770 F.2d 1070 (3d Cir.1985), *cert. denied*, 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986) (Judge Lacey read *Scott* as "expressing doubt that § 1985(3) reaches nonracial, politically motivated conspiracies").

The Court of Appeals for the Third Circuit, as well as the Supreme Court, however, "reserved comment on whether § 1985(3) embraces private conspiracies to discriminate on the basis of factors other than race.... " *Robison v. Canterbury Village Inc.*, 848 F.2d 424, 430 n. 7 (3d Cir.1988) (quoting *Rogin, supra,* at 697); *see Griffin, supra,* 403 U.S. at 102 n. 9, 91 S.Ct. at 1798 n. 9. In *Robison*, however, the court explicitly recognized that the Circuit previously held that a nonracial minority could maintain a cause of action under § 1985(3) against his employer for its allegedly racially discriminatory practices. *Id.* (*citing Richardson v. Miller*, 446 F.2d 1247 (3d Cir.1971)). In this regard, the court cited *Keating* and *Glasson* with approval, and implying that our circuit would construe the protections afforded under § 1985(3) liberally. Support for this view is also found in the appellate court's decisions in *C & K Coal Co. v. United Mine Workers of America*, 704 F.2d 690, 700 (3d Cir.1983) and *Novotny*.

Prior to both the issuance of *Robison* and *Scott*, Chief Judge Gibbons, speaking

for the Court in *C & K Coal Co., supra,* at 700 recognized that:

> Some of our cases have spoken about immutable characteristics,[33] but in context those references were merely indications of class characteristics which should be treated analogously with race. The question whether the statute protects against conspiracies, not involving state action, aimed at political classes, as well as classes whose members have the requisite immutable characteristics, is an open one in this court ...

> \*　　\*　　\*　　\*　　\*　　\*

> There is [however] significant legislative history suggesting that the Ku Klux Klan Act was intended to reach private conspiracies directed against Republicans.

Since neither the Supreme Court nor the Third Circuit has expressly held, one way or the other, that political animus satisfies the class-based invidious discriminatory practice necessary to state a cause of action under § 1985(3), *see Scott, supra; Robison, supra; Sellers, supra,* at 1211–12, I shall examine the statute and its history as described in *Novotny, supra,* to determine the scope of the class-based animus actionable under § 1985(3). *See Dudosh v. Allentown*, 629 F.Supp. 849, 853 n. 3 (E.D.Pa. 1985); *Skadegaard v. Farrell*, 578 F.Supp. 1209, 1219 (D.N.J.1984) (both acknowledging the viability of the Third Circuit's dicta in *Novotny* regarding the legislative history of § 1985(3), despite the reversal of its actual holding by the United States Supreme Court).[34]

---

**33.** It is likely that Chief Judge Gibbons was referring, at least in part, to the court's decision in *Carchman v. Korman Corp.*, 594 F.2d 354 (3d Cir.), *cert. denied*, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979) in which the court held that a class of tenant organizers are beyond the reach of the statute. Relying on *Griffin, supra,* 403 U.S. at 102, 91 S.Ct. at 1798, the court stated that to invoke the protection of the statute:

> There must be some racial or perhaps otherwise class based, invidiously discriminatory animus behind the conspirator's action.

Continuing the Court stated that:

> Unlike racial or sexual animus, animus against tenant organizers is not based upon immutable characteristics for which the mem-

bers of the class have no responsibility ... [or] have been the victims of the historically pervasive discrimination practiced against women.

*Id.* at 356. Apparently in *C & K Coal,* the court cut back on this narrow test that membership in a protected class requires that the class characteristics be the result of an accident of birth.

**34.** Although the Supreme Court reversed *Novotny* on the ground that § 1985(3) could not be used to remedy Title VII rights, this has not effected the viability of the portion of the appellate court's decision regarding its analysis of the scope of § 1985(3).

In *Novotny, supra,* at 1241, the appellate court reviewed the language and legislative history of § 1985(3) to determine if women were entitled to the benefit of its protection and observed that:

Section 2 of the Act was cast in general terms; it proscribed conspiracies aimed at depriving 'any person or class of persons' of equal protection and equal privileges. The breadth of such language was not adventitious. While the impetus toward enactment of the lineal ancester of § 1985(3) was supplied by concern regarding violence directed at blacks and Union sympathizers, the bill subsequently enacted contained no such limitations. As Judge Aldisert noted in *Brawer v. Horowitz,* [535 F.2d 830, 839 (3d Cir.1976),] Senator Edmunds, in reporting the amendments of the Ku Klux Klan Act to the Senate, interpreted the Act to command that:

If ... it should appear that this conspiracy was formed against a man because he was a Democrat, if you please, or because he was Catholic, or because he was a Methodist, or because he was a Vermonter ... this section could reach it.

Consequently, we find it difficult to conclude that Congress affirmatively intended to exclude women from protection. Indeed, the sole specific reference to women that we have been able to discover in the legislative history implies to the contrary. In the debate on the scope of the term 'privileges and immunities,' in the proposed § 2 of the 1871 Act, Senator Trumbull sought to prove that the right to vote was not a 'privilege or immunity' because women could not exercise the franchise. The burden of his argument seems to have been that women were protected in the enjoyment of rights which could properly be classified as 'privileges and immunities' and therefore rights from which women were admittedly excluded could not be 'privileges and immunities.' The underlying premise of this reasoning was that women are within the reach of § 2. The history of the statute thus leads us to determine that the language of § 1985(3) should not be unnaturally cropped to exclude women from its protection.

Chief Justice Warren wrote in a comparable context:

Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection.

\* \* \* \* \* \*

Although we can ascertain that § 1985(3) was intended to have a rather broad sweep, it is nonetheless difficult to parse the precise dimensions of the 'classes' which the Congress sought to protect, for, as the Supreme Court noted in *Tenney v. Brandhove,* 'The limits of §§ 1 and 2 of the 1871 statute ... were not spelled out in debate.'

In interpreting the language of the statute, the Supreme Court in *Griffin* said:

The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.

We need not determine here what classes other than those distinguished by race or gender may be within the ambit of § 1985(3). The Court in *Frontiero v. Richardson* [411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583] remarked: 'Congress itself has concluded that classifications based upon sex are inherently invidious.' And in discussing discrimination, the Court pointed out that sex, like race and national origin, is an immutable characteristic determined by the accident of birth and that the sex characteristic frequently bears no relation to ability to perform or contribute to society. Thus, to deprive members of a class founded on gender of equal protection or equal privileges and immunities without any justifi-

cation is to act in an irrational and odious manner—hence with an invidiously discriminatory animus.

The principle that individuals should not be discriminated against on the basis of traits for which they bear no responsibility makes discrimination against individuals on the basis of immutable characteristics repugnant to our system. The fact that a person bears no responsibility for gender, combined with the pervasive discrimination practices against women, and the emerging rejection of sexual stereotyping as incompatible with our ideals of equality convince us that whatever the outer boundaries of the concept, an animus directed against women includes the elements of a 'class-based invidiously discriminatory' motivation.

*Id.* at 1241–43 (footnotes omitted). The interpretation given by the Third Circuit,

and the fact that in *C & K Coal, supra,* the Circuit retreated from its apparent requirement that the protected class have "an immutable characteristic determined by the accident of birth," leads me to conclude that if confronted with the issue, the appellate court would interpret § 1985(3) to protect politically-based classes.

As I alluded to previously, I believe this to be so based in part on the circuit court's recent citation to *Keating. See Robison, supra.* In *Keating, supra,* at 387, the Second Circuit examined the legislative history of the statute and concluded that Congress intended to prohibit political discrimination in general. I agree with the analysis set forth in *Keating*[35] and find that conspiracies motivated by political animus are subject to liability under § 1985(3). I so conclude, fully aware of the doubt that

**35.** In *Keating, supra,* at 387–88, the Court stated that

> a narrow interpretation of the statute as protecting only blacks and other analogously oppressed minorities is untenable in light of the history of the Act. As noted above, the Ku Klux Klan Act was a response to President Grant's request for legislation empowering the federal government to end the Klan's anarchic tyranny and reestablish civil order. A century later, the view of the Act is apt to be distorted by the current perception of the Klan as a racist organization. The Congress of 1871, however, did not view the Klan solely as a racist organization to oppress blacks but as a political organization intent on establishing Democratic hegemony in the south. The Senate Select Committee to Investigate alleged Outrages in the Southern States concluded that the Klan 'has a political purpose, is composed of members of the democratic or conservative party, [and] has sought to carry out its purposes by murders, whippings, intimidations, and violence.' H.R.Rep. No. 1, 42nd Cong., 1st Sess. XXX, XXXii (1871). Congress believed that the victims of this violence were carpetbaggers or 'men of Union sentiment,' in a word, Republicans. Black or white, 'the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans.' Cong.Globe, 42nd Cong., 1st Sess. 412, col. 3, 413, col. 1 (1871) (remarks of Congressman Roberts). 'The dead and the wounded, the maimed and the scourged, are all, all Republicans.' *Id.* at 426, col. 3 (remarks of Congressman McKee). '[E]very victim of Ku Klux outrage has been a Republican.' *Id.* at 437, col. 2 (remarks of Congressman Cobb). The Klan's object is 'the defeat of Republicanism.'

> *Id.* at app. 196, col. 2 (remarks of Congressman Snyder). The Klan's 'systematic plan ... is not to leave in any of those States a brave white man who dares to be a Republican or a colored man who dares to be a voter.' *Id.* at 702, col. 1 (remarks of Senator Edmunds). The Klan's 'purpose is by these inumerable and nameless crimes to drive those who are supporting the Republican Party to abandon their political faith or to flee from the state' (or at least to quit their jobs in the state civil service). *Id.* at app. 252, col. 1 (remarks of Senator Morton). Finally, those 'who vote with the party ... or who accept a petty office from a Republican Administration, are in much of the country continually in imminent peril for their lives.' *Id.* at 654, col. 1 (remarks of Senator Osborn).

> In our view, Congress did not seek to protect only Republicans, but to prohibit political discrimination in general. At least one informed Republican Senator acknowledged that the Act would have to be applied to conspiracies against a man 'because he was a Democrat ... or ... a Catholic, ... or ... a Methodist, or ... a Vermonter.' Cong.Globe, 42nd Cong., 1st Sess. 567, col. 2 (1871) (remarks of Senator Edmunds of Vermont).

> Nothing in the many cases applying the statute to racial discrimination suggests that we should now turn history on its head and exclude from protection the group that seems to have been foremost in the mind of Congress. Indeed, several courts have held that political discrimination is prohibited by § 1985. (citations omitted).

On this basis the court held that a conspiracy motivated by political animus satisfies the *Griffin* requirement under § 1985(3) of class-based discriminatory animus.

the Supreme Court's decision in *Scott* has shed upon the conclusion that political groups are entitled to § 1985(3) protection. As stated previously, the Supreme Court did not specifically rule on the validity of the interpretations of § 1985(3) as protecting such classes. Rather, the Court acknowledged that there was support in the legislative history upon which to base this interpretation. Thus, in light of this recognition, and in the absence of a clear ruling on this issue by the Supreme Court, those decisions which hold that politically motivated conspiracies are within the act remain intact and I shall follow them. *See Stevens, supra,* at 725.

█ Thus, in light of the manner in which this circuit has interpreted § 1985(3), the absence of Supreme Court authority to the contrary, the legislative history of the act, and the paramount interest in permitting minority political groups to exercise their rights, I find that § 1985(3) sanctions politically motivated conspiracies, and consequently allows those injured by conduct of the conspirators to obtain relief for injuries they caused. *See Stevens, supra,* at 725.

█ Having concluded that plaintiff's membership in a political group (i.e., McCann supporters) places him within a class entitled to protection under § 1985(3), I shall now examine whether or not plaintiff has proven that a conspiracy existed to deprive him equal protection of law.

█ The direct and circumstantial evidence reveals that the four defendants conspired to violate plaintiff's first amendment rights. The record reveals, for example, that Councilman Vazquez, as a Cucci supporter, specifically intended to seek revenge against the McCann campaigners, particularly the plaintiff. Indeed, he stated on more than one occasion that plaintiff would be "taken care of" for his aggressive support of the McCann ticket. To facilitate this end, campaign workers were instructed to keep tabs on the conduct of city police officers and report any harassment to senior campaign staffers. Mayor Cucci, as the leader of the group, silently but knowingly, acquiesced in plans for re-

taliation against such officers. He did not close his eyes nor his ears to the plan to impose a penalty for their political support. He kept his mouth shut, and thereby, as leader, gave tacit approval. Defendant Adams' and Lopez's agreement to sanction plaintiff on account of his political affiliation is manifest in their approval of the demotion. For these reasons, I find that plaintiff has proven the existence of a conspiracy.

Third, there is no doubt that the purpose of the agreement to penalize plaintiff was to sanction him for his support of a particular mayoral candidate. The historical post-election staffing decisions in the JCPD reflect that promotions/demotions within the detective/patrolmen ranks were based upon political support; those who supported the victorious administration were promoted and those who supported the losing candidate were demoted. Plaintiff has demonstrated that the same procedure operated in 1985 and for the reasons stated previously, I find that the defendants protestations to the contrary are without merit. Thus, as it was "business as usual" in Jersey City, I find that the conspiracy to demote plaintiff was based upon his political affiliation. As stated previously, political expression and association are protected by the first amendment. Defendants actions, through which they penalized the exercise of these rights, satisfies the third element of the test under § 1985(3).

Fourth, with respect to the acts that the co-conspirators took in furtherance of the conspiracy the record reflects that defendant Vazquez expressed his desire that plaintiff receive a less pleasant assignment to Cucci and other members of his inner circle. In addition, defendant Cucci deliberately stayed his hand, despite his power to prevent any retaliatory conduct. Moreover, defendants Lopez and Adams advanced the goals of the conspiracy by ordering and formally approving of the demotion, retroactive to July 1, 1985, the first day the Cucci administration assumed power. Each defendant, in planning and facilitating plaintiff's demotion, engaged in acts that furthered the conspiracy to penalize

plaintiff for the exercise of his rights to free speech and association.

Fourth, plaintiff has demonstrated, *see supra* n. 13, that the demotion injured him as it resulted in a loss of pay. Moreover, as stated previously, defendants' actions were aimed at the deprivation of plaintiff's first amendment rights.

Thus, for all of the above reasons, I find that defendants Cucci, Vazquez, Lopez and Adams conspired to violate plaintiff's rights and hence are each liable for violating 42 U.S.C. § 1985(3).

### C. Section 1986

■■■ Section 1986 of Title 42 provides, in pertinent part:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured ... for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action....

In *Rogin, supra*, at 696, the Court of Appeals for the Third Circuit stated:

> Section 1986 is a companion to § 1985(3) and provides the claimant with a cause of action against any person who, knowing that a violation of § 1985 is about to be committed and possessing power to prevent its occurrence, fails to take action to frustrate its execution. Because transgressions of § 1986 by definition depend on a preexisting violation of § 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fall also.

(footnotes omitted). *See also Robison, supra*, at 431 n. 10. Since plaintiff has demonstrated that defendants have violated § 1985(3), he has satisfied the first requisite of an action under § 1986. In addition to satisfying this element, plaintiff must also show:

> (1) Defendant had actual knowledge of the conspiracy to deprive plaintiff of the rights protected under § 1985.
>
> (2) Defendant had the power and an opportunity to prevent or aid the preventing of, the resultant deprivation of rights.
>
> (3) Defendant neglected, failed, or refused to prevent the success of such a conspiracy and, as a result
>
> (4) wrongful acts have been committed.

*See Buck v. Board of Education*, 536 F.2d 522, 524 (2d Cir.1976); *Hampton v. City of Chicago*, 484 F.2d 602, 610 (7th Cir.1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); *Rogin, supra*, at 696; *Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*, 518 F.Supp. 993, 1007 (S.D.Tex.1981) (*quoting Dowsey v. Wilkins*, 467 F.2d 1022, 1026 (5th Cir.1972)); *Riccobino v. Whitpain Twnshp.*, 497 F.Supp. 1364, 1371 (E.D.Pa.1980); *Thompson v. State of New York*, 487 F.Supp. 212, 228–29 (N.D.N.Y.1979); *Santiago, supra*, at 156.

Applying these elements to the case at bar, the record reflects that each defendant knew of the agreement to penalize plaintiff for his political support of former Mayor McCann. Defendant Vazquez specifically articulated his desire that plaintiff be sanctioned for his political allegience in the form of a less desirable patrol assignment. Lopez and Adams each approved the ultimate demotion. Finally, the close relationship between Cucci and his inner circle, which included Lopez and Vazquez, and the awareness these individuals had regarding their friends and foes supports a conclusion that Mayor Cucci was aware of an understanding that Perez and others similarly situated would be "taken care of."

Second, defendants Lopez, Adams, and Cucci had the power to prevent the sanction against plaintiff for the exercise of his first amendment rights. Adams, as director of department, had managerial discretion regarding assignments. *See* Rule of the Rules and Regulations of the Jersey

City Police Department. Mr. Lopez, as city business administrator, authorized the change in plaintiff's personnel status, and had the concurrent authority to withhold such approval. Mayor Cucci, as chief executive of the city, had the power to oversee the operations of an executive department, such as the police force, and had the power to prevent the wrongful conduct of his appointed agents. Councilman Vazquez, however, is a member of the legislative branch of the city's government and, as such, has no authority over executive agencies or its personnel. Therefore, as Vazquez lacked the power to have prevented the commission of the wrongful acts, plaintiff is not entitled to relief from Vazquez under § 1986. Since defendants Lopez, Cucci and Adams held positions in which they had the capacity to prevent the violations, plaintiff has proven the second element of his claim under § 1986 as against them.

Third, there is no doubt that defendants Cucci, Adams, and Lopez failed to prevent the imposition of a sanction against plaintiff for his exercise of his first amendment rights. Indeed, as previously noted, each of these defendants either knew of the desire to retaliate against on plaintiff or facilitated his ultimate demotion and despite the authority and/or control they could have exercised to prevent same, they not only remained reticent, but in fact took steps to assure that plaintiff was penalized for his political associations and experience. Moreover, despite notification of plaintiff's belief that his demotion was politically motivated, defendant did nothing to investigate this claim.

Finally, as set forth more explicitly in my discussion regarding defendants' violation of plaintiff's first amendment rights, the record clearly demonstrates that as a result of his vigorous support for the losing mayoral candidate, the new administration retaliated against him by demoting him from plainclothes detective to uniformed patrolman.

For all of the above reasons, I find that plaintiff has satisfied all of the elements to impose liability on defendants Lopez, Cucci, and Adams, pursuant to 42 U.S.C. § 1986.

### D. Conclusions Regarding Liability.

For all of the above reasons, I find that defendants Cucci, Adams, Lopez, and Vazquez have violated 42 U.S.C. §§ 1983 and 1985, and that defendants Cucci, Adams and Lopez violated 42 U.S.C. § 1986. In light of these conclusions, I shall now turn to the relief to which plaintiff is entitled.

### E. Damages and Equitable Relief.

■ While congress did not specifically address the type of damages recoverable for violations of the civil rights statutes, *see Carey v. Piphus*, 435 U.S. 247, 255, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978), the case law construing the statute makes clear that a plaintiff who has proven a violation of §§ 1983, 1985(3), and 1986 is entitled to recover nominal, compensatory and punitive damages as well as damages for any emotional distress actually caused by the deprivation of civil rights. *Id.* at 257 n. 11, 263–64, 265, 98 S.Ct. at 1049 n. 11, 1052–53, 1053; *Smith v. Wade*, 461 U.S. 30, 35–36, 103 S.Ct. 1625, 1627–29, 75 L.Ed.2d 632 (1983); *City of Newport v. Fact Concerts Inc.*, 453 U.S. 247, 269, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981); *Novotny, supra,* 442 U.S. at 376, 99 S.Ct. at 2351; *Laskaris, supra,* at 264; *Glasson, supra.* Successful plaintiffs may also obtain equitable relief in the form of back pay, reinstatement and injunctive relief. *See Laskaris, supra,* at 263; *Santiago, supra; Freeman & Bass PA v. State of New Jersey*, 359 F.Supp. 1053, 1059–61 (D.N.J.1973); *see also Monell v. Department of Social Serv.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). Additionally, pursuant to 42 U.S.C. § 1988, the court may award attorney's fees to the prevailing party to an action to enforce §§ 1983, 1985 and 1986. *See Monell, supra,* at 698–99, 98 S.Ct. at 2040; *Hutto v. Finney*, 437 U.S. 678, 700, 98 S.Ct. 2565, 2578, 57 L.Ed.2d 522 (1978). The amount of the fees awarded depends upon application of the principles set forth in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79

L.Ed.2d 891 (1984), and *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) and their progeny.

In this case, plaintiff seeks:

(1) compensatory damages (such as for lost wages and overtime);

(2) reimbursement for expenses he incurred as a result of his relocation to California;

(3) compensation for the emotional distress and humiliation he experienced as a result of defendants' conduct;

(4) punitive damages;

(5) reinstatement;

(6) back pay;

(7) an injunction that blocks future application of the four-year criterion;

(8) an injunction that prohibits defendants from considering the political affiliation of any employee of the JCPD in making personnel decision; and

(9) attorneys' fees.

I shall examine each of his requests below.

■ With respect to his request for compensatory damages, I note that an award of such relief is proper to compensate plaintiff for injuries sustained as a direct result of the defendants' conduct, which deprived plaintiff of his civil rights. *Smith, supra* 461 U.S. at 52 n. 15, 103 S.Ct. at 1638 n. 15; *Carey, supra.* In this case, plaintiff has demonstrated that as a result of defendants' actions, plaintiff was demoted and his salary was decreased. Hence, plaintiff is entitled to recover the salary that he would have earned had he not been demoted. Excluding the period that he was on leave and earning a salary from the LAPD, plaintiff is entitled to recover the difference between the salary that he would have earned as a detective and that he earned as a police officer. As explained in note 13, the differential amounts to $4,298.05. I shall award plaintiff $4,298.05 in compensatory damages. I note that this also reflects the award of back pay to which plaintiff is entitled.

■ With respect to his request that he receive compensation for lost overtime, I find that plaintiff has failed to demonstrate the amount of overtime he would have worked during the relevant period. In fact, defendants have demonstrated that the amount of overtime available depends in large part on the nature of the assignment and the number of arrests made. Plaintiff has not shown, with great certainty, that he would have been performing assignments that would involve guaranteed amounts of overtime. Therefore, any award for lost time would be speculative and as such his request for such an award on this record must be denied.

■ Plaintiff's request for compensation for expenses incurred as a result of his move to California is also denied. As I explained in my findings of fact, plaintiff has actively sought employment with the LAPD long before the partisan activities that gave rise to the within action. Moreover, as late as April of 1985, prior to the initial mayoral election, plaintiff contacted the LAPD to see if his application remained valid. Thereafter, he was informed that it was and was notified that a new training class was scheduled to begin in July 1985. While the timing of this notification coincided with his demotion, I do not find that defendants' actions caused plaintiff to relocate 3000 miles away. Rather, I find that plaintiff actively sought an opportunity to join the LAPD and seized same when presented to him. While his decision to do so may have been in part motivated by his desire to leave a position that he considered less than desirable, I do not find that defendants' conduct was the cause for his decision to join the LAPD. Therefore, I shall not award him compensation for the expenses he incurred in connection with this move.

■ Similarly, I shall not award plaintiff damages allegedly sustained as a result of any emotional distress that he claims that he suffered. As I explained in note 19, plaintiff sought treatment for his alleged distress more than two and one half years after the events at issue, assumed a position with the LAPD for the period immediately following the unconstitutional events, resumed his position with the JCPD through March 1, 1988, and experienced numerous stressful events during the rele-

vant period. These factors reveal that the emotional distress that plaintiff has allegedly suffered was not the result of defendants' unconstitutional conduct. For the reasons stated therein, I decline to award plaintiff damages for emotional distress.

■ Plaintiff also seeks an award of punitive damages. Punitive damages, which may be awarded even in the absence of actual damages, "at least where the plaintiff shows that defendants' conduct is motivated by evil motive or intent, or that it involves reckless or callous indifference to others' federally protected rights." *Laskaris, supra* at 264 (*citing Smith, supra,* 461 U.S. at 56, 103 S.Ct. at 16); *Basista v. Weir,* 340 F.2d 74, 87–88 (3d Cir.1965). Any award of punitive damages should not go beyond deterrence and become a windfall. *See, e.g., Bell v. City of Milwaukee,* 746 F.2d 1205, 1267 (7th Cir.1984). To this end, the Court of Appeals for the Third Circuit has stated that any award of punitive damages must bear a reasonable relationship to the compensatory damages award.[36] *See Levinson v. Prentice Hall,* 868 F.2d 558, 564–66 (3d Cir.1989).

■ With these principles in mind, I find that defendants' demotion of plaintiff was motivated not only by a callous indifference to plaintiff's constitutional rights, but in utter disregard of same. Defendants carried out a plan to penalize plaintiff for his political associations and expression. The impunity with which they acted is demonstrated by the fact that they wreaked retribution on the first occasion on which they had the power to do so. Defendants should be punished for such conduct. Therefore, I shall award plaintiff punitive damages in the amount of $25,000. This amount bears a reasonable relationship to the magnitude of constitutional harm plaintiff suffered and, hence, is proper under the dictates of *Levinson.*

■ I shall also grant plaintiff's request for an order of reinstatement. Reinstatement is a preferred equitable remedy as it places plaintiff in the position he would have been in had the unlawful conduct not occurred. *See, e.g., Blum v. Witco Chemical Corp.,* 829 F.2d 367, 373 (3d Cir.1987); *Maxfield v. Sinclair In'tl.,* 766 F.2d 788, 795–96 (3d Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). There is no evidence to suggest that there exists irreparable anomosity between plaintiff and those with whom he would work. *See Blum, supra,* at 374. In fact, he left the department in good standing and with a reputation as a "good cop." For these reasons, I find that reinstatement is feasible, and I order that plaintiff be reinstated as a detective at the experience level that he would have occupied at the time of his retirement, June 1, 1988, and with the commensurate benefits and seniority that he had accrued up to that time.

■ With respect to plaintiff's dual requests for injunctive relief, I find first, that defendants should not be enjoined from employing the four-year criterion. While I believe the rationale given for its use was subterfuge for the actual basis for which plaintiff and others similarly situated were demoted, I do not believe it is proper for the Court to interfere with the four-year criterion as it may be currently employed without discriminatory purpose or intent. Although its application with respect to plaintiff in 1985 was constitutionally infirm, a total prohibition on its use would constitute unnecessary judicial interference in the internal operations of a city department. Hence, while I find its application in 1985 to have been unconstitutionally based on political affiliation, I find that this does not support enjoining its application entirely, and therefore plaintiff's request that I do so is denied.

■ I shall grant plaintiff's request that defendants be enjoined from using political affiliation as a basis for personnel decisions for nonpolicymaking employees in the JCPD. The issuance of this injunction merely reinforces what defendants are al-

**36.** This, of course, is not to say that the absence of proof of harm for which compensatory damages may be awarded bars an award of punitive damages for unconstitutional conduct. *See Carey, supra, Basista, supra* at 88.

ready prohibited from doing under the tenets of *Elrod, supra* and *Branti, supra.* Based on the principles set forth in these cases, and their progeny; and as plaintiff has proven defendants have violated same, I shall grant plaintiff's request to enjoin defendants from using political affiliation as a basis for making personnel decisions for those holding the type of positions described in *Branti, supra, Elrod, supra, Trench, supra,* and *Laskaris, supra.*

Finally, as plaintiff is a prevailing party, he is entitled to recover attorney fees pursuant to 42 U.S.C. § 1988. The amount of this award shall be determined upon a properly submitted fees application that documents the hours of attorney time expended, the hourly rate, and the tasks performed and services provided. Said application should be prepared in accordance with the General Rules of the United States District Court as well as the case law set forth in *Hensley, supra, Blum, supra,* and their progeny.

For all of the above reasons plaintiff is hereby awarded $4,298.05 in compensatory damages and back pay, $25,000 in punitive damages, attorneys fees, shall hereby be reinstated as a detective, at the level he would have reached at the time of his resignation, and defendants are hereby enjoined from using the political affiliation of a non-policymaking employee of the JCPD as a basis for personnel decisions.